# SIKORSKY AIRCRAFT CORPORA-
# TION *v.* COMMISSIONER OF
# REVENUE SERVICES
# (SC 18302)

Rogers, C. J., and Katz, Palmer, Vertefeuille,
Zarella and McLachlan, Js.*

---

\* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

Argued February 18—officially released July 27, 2010

*Philip Miller*, assistant attorney general, with whom were *Louis P. Bucari, Jr.*, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan Quinn Cobb*, assistant attorney general, for the appellant (defendant).

*Charles H. Lenore*, with whom was *Erick M. Sandler*, for the appellee (plaintiff).

*Opinion*

McLACHLAN, J. General Statutes § 12-412 (78) (aircraft manufacturing exemption) exempts from the sales

and use tax the "sales of and the storage, use or other consumption by an aircraft manufacturer operating an aircraft manufacturing facility in this state of materials, tools, fuel, machinery and equipment used in such facility. . . ."[1] This appeal requires us to resolve whether the legislature intended the aircraft manufacturing exemption to extend to items used in connection with research and development at an aircraft manufacturing facility. The defendant, the commissioner of revenue services (commissioner), appeals[2] from the judgment of the trial court sustaining the appeal of the plaintiff, Sikorsky Aircraft Corporation, from the commissioner's decision denying in part the plaintiff's request for refunds of sales and use tax pursuant to the aircraft manufacturing exemption. The commissioner claims that the trial court improperly concluded that the aircraft manufacturing exemption encompasses research and development items, and, in the alternative, that the plaintiff did not provide sufficient evidence to meet its burden of establishing that all of the disputed items qualified for the aircraft manufacturing exemption. The

---

[1] General Statutes § 12-412 provides in relevant part that the sales and use tax "shall not apply to the gross receipts from the sale of and the storage, use or other consumption in this state with respect to the following items . . .

"(78) On or after July 1, 1993, sales of and the storage, use or other consumption by an aircraft manufacturer operating an aircraft manufacturing facility in this state of materials, tools, fuel, machinery and equipment used in such facility. For purposes of this subsection, (A) 'machinery and equipment' means tangible personal property (i) which is installed in an aircraft manufacturing facility operated by an aircraft manufacturer and (ii) the predominant use of which is for the manufacturing of aircraft or aircraft parts or components or for the significant overhauling or rebuilding of aircraft or aircraft parts or components on a factory basis and (B) 'aircraft manufacturing facility' means that portion of a plant, building or other real property improvement used for the manufacturing of aircraft or aircraft parts or components or for the significant overhauling or rebuilding of aircraft or aircraft parts or components on a factory basis. . . ."

[2] The commissioner appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

plaintiff claims that because this issue was decided against the commissioner in a previous action, the doctrine of collateral estoppel bars the commissioner from relitigating it in the present action. Because we conclude that the aircraft manufacturing exemption encompasses the research and development items at issue, we affirm the judgment of the trial court.

The trial court found the following relevant facts. The plaintiff, "a wholly owned subsidiary of United Technologies Corporation, manufactures helicopters, as well as their parts and components, at its manufacturing facility in Stratford. . . .

"During the audit period from April 1, 1995 through December 31, 2002 [audit period], [the plaintiff] purchased various materials, tools, fuel, machinery and equipment for use in its Stratford facility for the production of helicopters. During this period of time, [the plaintiff] paid sales tax to its vendors or self-assessed and paid use tax to the commissioner. Subsequent to this period, [the plaintiff] sought a refund of these taxes paid claiming that the purchases were exempt from sales and use taxes under [the aircraft manufacturing exemption].[3]

"The commissioner conducted a sales and use tax audit of [the plaintiff] and concluded that while some purchases were entitled to an exemption resulting in a net refund of approximately [$1.9 million] the balance of [the plaintiff's] purchases did not qualify for an exemption under [the aircraft manufacturing exemption] because they were purchased solely for [research and development], not manufacturing." The plaintiff petitioned for reassessment and protested the proposed disallowance for the audit period. The commissioner's final determination assessed $570,835.34 in use taxes

---

[3] The plaintiff sought a refund with respect to 3500 items.

owed by the plaintiff, and disallowed $916,599.77 of the plaintiff's requested refund.

The trial court sustained the plaintiff's appeal from the final determination on the ground that, pursuant to the aircraft manufacturing exemption, the items at issue were exempt from the sales and use tax during the audit period.[4] This appeal followed.

I

We first address the plaintiff's claim that the commissioner is collaterally estopped from litigating the issue of whether the items are tax exempt pursuant to the aircraft manufacturing exemption. The plaintiff argues that the issue of whether the aircraft manufacturing exemption applies to the type of aircraft property at issue in the present case was litigated and decided against the commissioner in *Pratt & Whitney* v. *Commissioner of Revenue Services*, Superior Court, judicial district of New Britain, Tax Session, Docket Nos. CV-01-0509576S and CV-01-0509577S (July 3, 2002). In that case, two other divisions of United Technologies Corporation, Pratt and Whitney and Hamilton Standard, claimed that they were entitled to the aircraft manufacturing exemption for materials, tools, machinery and equipment used for research and development. Id. The commissioner responds that nonmutual collateral estoppel cannot be invoked against the state. We agree with the commissioner.

"The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of

[4] The trial court based its decision on the manufacturing process employed by the plaintiff, involving the utilization of "integrated product development teams" or "integrated product teams," a manufacturing process that the trial court found is no longer a "novel approach" to manufacturing. See footnote 16 of this opinion. In its memorandum of decision on the commissioner's motion for articulation and reconsideration of the trial court's decision, the trial court emphasized that it had based its conclusion on the integrated nature of the manufacturing process employed by the plaintiff.

judicial economy, the stability of former judgments and finality. . . . Collateral estoppel . . . prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties [or those in privity with them] upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Internal quotation marks omitted.) *Birnie* v. *Electric Boat Corp.*, 288 Conn. 392, 405, 953 A.2d 28 (2008).

"Under the mutuality rule, [p]arties who were not actually adverse to one another in a prior proceeding could not assert collateral estoppel against one another in a subsequent action." (Internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 135, 733 A.2d 817 (1999). Principles of judicial economy, however, support the application of the doctrine of collateral estoppel to private parties despite a lack of mutuality. See *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 302, 596 A.2d 414 (1991) (joining majority of jurisdictions by abandoning mutuality rule, reasoning that: "[t]o allow a party who has fully and fairly litigated an issue at a prior trial to avoid the force of a ruling against him simply because he later finds himself faced by a different opponent is inappropriate and unnecessary"). Allowing private parties to invoke the doctrine of nonmutual collateral estoppel against each other avoids repetitive litigation that unnecessarily taxes scarce judicial resources. Id. A set of different public policies is implicated, however, when the state is a party. In *United States* v. *Mendoza*, 464 U.S. 154, 159, 104 S. Ct. 568, 78 L. Ed. 2d 379 (1984), the United States Supreme Court explained that "the [g]overnment is not in a position identical to that of a private litigant . . . most importantly, because of the nature of the issues the [g]overn-

ment litigates." (Citation omitted; internal quotation marks omitted.) The court observed that litigation in which the government is a party often involves "questions of substantial public importance" and that "many constitutional questions can arise only in the context of litigation to which the [g]overnment is a party. Because of those facts the [g]overnment is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues." Id., 160. "A rule allowing nonmutual collateral estoppel against the [g]overnment . . . would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." Id. The same policy reasons that guided the United States Supreme Court in concluding that nonmutual collateral estoppel should not be applied against the federal government persuade us that it should not apply against the state.

## II

We next address the commissioner's claim that the trial court improperly concluded that the aircraft manufacturing exemption encompasses research and development items. The commissioner argues that this question turns on the interpretation of the phrase "aircraft manufacturing facility" as used and defined in the aircraft manufacturing exemption, and, in turn, on the meaning of the term "manufacturing." Although we agree with the commissioner that the question turns on the interpretation of those terms, we conclude that the trial court properly construed and applied the aircraft manufacturing exemption in the present case.

Because the issue presents a question of statutory interpretation, our review is plenary. *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 679, 986 A.2d 290 (2010). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to

the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) Id. Moreover, in interpreting tax exemptions, "we employ three overlapping presumptions. First, statutes that provide exemptions from taxation are a matter of legislative grace that must be strictly construed against the taxpayer. Second, any ambiguity in the statutory formulation of an exemption must be resolved against the taxpayer. Third, the taxpayer must bear the burden of proving the error in an adverse assessment concerning an exemption." (Internal quotation marks omitted.) *Achillion Pharmaceuticals, Inc.* v. *Law*, 291 Conn. 525, 532 n.8, 970 A.2d 57 (2009). For the reasons that follow, we conclude that the statute does not have a plain meaning.

As directed by § 1-2z, we turn first to the text of the statute itself. The aircraft manufacturing exemption exempts from the sales and use tax "sales of and the storage, use or other consumption by an aircraft manufacturer operating an aircraft manufacturing facility in this state of materials, tools, fuel, machinery and equipment used in such facility. For purposes of this subsection, (A) 'machinery and equipment' means tangible personal property (i) which is installed in an aircraft

manufacturing facility operated by an aircraft manufacturer and (ii) the predominant use of which is for the manufacturing of aircraft or aircraft parts or components or for the significant overhauling or rebuilding of aircraft or aircraft parts or components on a factory basis and (B) 'aircraft manufacturing facility' means that portion of a plant, building or other real property improvement used for the manufacturing of aircraft or aircraft parts or components or for the significant overhauling or rebuilding of aircraft or aircraft parts or components on a factory basis." General Statutes § 12-412 (78).

On two different levels, the meaning of "manufacturing" is central to understanding the scope of the aircraft manufacturing exemption. First, the aircraft manufacturing exemption applies only to materials, tools, fuel, equipment and machinery that are used in an "aircraft manufacturing facility." The definition of "aircraft manufacturing facility" relies on the particular use made of the facility or a portion of the facility. That is, an aircraft manufacturing facility is "that *portion* of a plant, building or other real property improvement used for the *manufacturing* of aircraft or aircraft parts or components or for the significant overhauling or rebuilding of aircraft or aircraft parts or components on a factory basis." (Emphasis added.) General Statutes § 12-412 (78) (B). In short, the term applies to that portion of the facility used either for manufacturing or for significant overhauling of aircraft.[5] The fact that the definition of "aircraft manufacturing facility" allows for a "portion"

---

[5] Because in the present case the plaintiff sought exemptions based only on manufacturing of aircraft, and not on overhauling, we need not consider the meaning of the phrase "significant overhauling" in the aircraft manufacturing exemption. Subsequent discussion within this opinion of the scope of the aircraft manufacturing exemption will make reference only to the manufacturing of aircraft or aircraft parts, and not to overhauling, and we express no opinion as to whether the law would be applied differently to overhauling.

of a facility owned by an aircraft manufacturer to qualify for the aircraft manufacturing exemption indicates that the legislature intended to limit the scope of the aircraft manufacturing exemption. In other words, the language signifies that the legislature did not intend that every portion of a facility owned by an aircraft manufacturer automatically be considered an "aircraft manufacturing facility" for purposes of the aircraft manufacturing exemption—only that portion of the facility that is used for manufacturing or significant overhauling qualifies. Thus, in determining which portion of a plant, building or other real property development is used for the manufacturing of aircraft or aircraft parts it is essential to determine the meaning and scope of the term "manufacturing."

Second, the general structure of the aircraft manufacturing exemption reveals another sense in which the definition of manufacturing determines the exemption's contours and limits. The aircraft manufacturing exemption contemplates two different standards applied to, on the one hand, materials, tools and fuel, and, on the other hand, machinery and equipment. Both standards are implicated in the present case. In order to be exempt from the sales and use tax, both categories of items must be used: (1) by an aircraft manufacturer operating an aircraft manufacturing facility in this state;[6] (2) in the aircraft manufacturing facility. As for materials, tools and fuel, these are the only two requirements. For machinery and equipment, however, an additional element must be shown: their predominant use must be for the manufacturing of aircraft. Thus, although it does not matter for purposes of the aircraft manufacturing exemption how materials, tools and fuel are used, it *does* matter how machinery and equipment are used—

---

[6] It is undisputed that the plaintiff is "an aircraft manufacturer operating an aircraft manufacturing facility in this state . . . ." General Statutes § 12-412 (78).

the predominant use must be manufacturing. From this structure, it is clear that the legislature intended that: (1) machinery and equipment be treated differently from material, tools and fuel with regard to whether they are exempt; and (2) the distinction between the treatment of the two sets of items depends on the meaning of "manufacturing."

Thus, the plain language of the statute leads us to the central question in this appeal: what does the term "manufacturing" mean in the aircraft manufacturing exemption? The definition of that term is necessary in order to understand both the phrase "aircraft manufacturing facility" in the aircraft manufacturing exemption, and the distinction that the statute draws between materials, tools and fuel, on the one hand, and machinery and equipment, on the other. As required by § 1-2z, we look to related statutes for assistance in ascertaining the meaning of the term "manufacturing." Although the aircraft manufacturing exemption does not define the term "manufacturing," the legislature did define "manufacturing" in a provision of the Manufacturing Recovery Act (MRA), General Statutes § 12-412i,[7] which was enacted earlier in the same year as the aircraft manufacturing exemption and defines " '[m]anufacturing' " as "the activity of converting or conditioning tangible personal property by changing the form, composition, quality or character of the property for ultimate sale at retail or use in the manufacturing of a product to be ultimately sold at retail. . . ."[8] General Statutes § 12-412i (b) (1).

[7] Although § 12-412i comprises only one section of No. 92-193 of the 1992 Public Acts, also known as the Manufacturing Recovery Act of 1992, both the trial court and the parties consistently have referred to § 12-412i as the MRA. For the sake of consistency, we employ the same terminology.

[8] General Statutes § 12-412i provides in relevant part: "(a) The taxes imposed by this chapter shall not apply to the percentage set forth in subsection (c) of this section of the gross receipts from the sale of and the storage, use and consumption in this state of the following items: (1) Materials, tools and fuels or any substitute therefor which become an ingredient or component part of tangible personal property to be sold or which are used or consumed in an industrial plant in the manufacturing, processing

In order to understand the significance of this definition for purposes of the aircraft manufacturing exemption, it is helpful first to set forth the evolution of the legislature's approach to tax exemptions for items used in manufacturing generally and those later enacted for

---

or fabricating of products to be sold, in any process preparatory or related thereto or in the measuring or testing of such products or (2) machinery and equipment which will be used primarily in the process of manufacturing, processing or fabricating tangible personal property if: (A) The machinery or equipment is used for research and development, measuring or testing with respect to or in furtherance of the manufacturing, processing or fabricating of tangible personal property; (B) the machinery or equipment is used at any stage of the manufacturing, processing or fabricating process from the time any raw materials are received to the time the product is ready for delivery or storage, including overpacking and crating; (C) the machinery or equipment is used primarily to maintain or repair any machinery or equipment described in subparagraph (A) or (B) of this subdivision, or (D) the machinery or equipment is used primarily for metal finishing, provided this exemption shall not apply to any materials, tools, fuels, machinery or equipment which is used primarily in administration, general management, sales or any other activity which does not constitute manufacturing, processing or fabricating. . . .

"(b) As used in this section: (1) 'Manufacturing' means the activity of converting or conditioning tangible personal property by changing the form, composition, quality or character of the property for ultimate sale at retail or use in the manufacturing of a product to be ultimately sold at retail. Changing the quality of property shall include any substantial overhaul of the property that results in a significantly greater service life than such property would have had in the absence of such overhaul or with significantly greater functionality within the original service life of the property, beyond merely restoring the original functionality for the balance of the original service life; (2) 'fabricating' means to make, build, create, produce or assemble components or tangible personal property so that they work in a new or different manner; (3) 'processing' means the physical application of the materials and labor necessary to modify or change the characteristics of tangible personal property . . . .

"(c) The gross receipts from the sale of and the storage, use and consumption in this state of the items set forth in subsection (a) of this section shall be exempt from the taxes imposed by this chapter, to the following extent: (1) For sales made on or after January 1, 1993, and prior to July 1, 1993, ten per cent of the gross receipts from such items; (2) for sales made on or after July 1, 1993, and prior to July 1, 1994, twenty per cent of the gross receipts from such items; (3) for sales made on or after July 1, 1994, and prior to July 1, 1995, thirty per cent of the gross receipts from such items; (4) for sales made on or after July 1, 1995, and prior to July 1, 1996, forty

aircraft manufacturers specifically. We examine the evolution of the legislature's understanding of manufacturing in the four relevant statutory provisions, specifically, the MRA and § 12-412 (18) and (34),which apply to manufacturing generally, and the aircraft manufacturing exemption, which applies to the aircraft industry specifically. In brief summary, that evolution began, in § 12-412 (18) and (34), with 100 percent exemptions for certain items used in direct connection with manufacturing, expanded under the MRA to include a 50 percent exemption for items used in processes related to manufacturing, including research and development, and, finally, ended with the aircraft manufacturing exemption, which the plaintiff asserts allows aircraft manufacturers a 100 percent exemption for all items that were entitled to a 50 percent exemption pursuant to the MRA. We now examine these statutes in greater detail in order better to discern the intended scope of the aircraft manufacturing exemption.

Prior to the enactment of the MRA in 1992; see Public Acts 1992, No. 92-193; two separate subsections of § 12-412 provided 100 percent exemptions to all manufacturers in connection with certain aspects of manufacturing. Specifically, § 12-412 (18) provided a full exemption from the sales and use tax for "materials . . . tools and fuel or any substitute therefor, which become an ingredient or component part of tangible personal property to be sold or which are used *directly* . . . in an industrial plant in the *actual fabrication* of the finished product to be sold. . . ."[9] (Emphasis added.) Section

per cent of the gross receipts from such items; and (5) for sales made on or after July 1, 1996, fifty per cent of the gross receipts from such items. . . ."

[9] General Statutes § 12-412 (18) exempts from the sales and use tax: "Sales of and the storage or use of materials, rope, fishing nets, tools and fuel or any substitute therefor, which become an ingredient or component part of tangible personal property to be sold or which are used directly in the fishing industry or in an industrial plant in the actual fabrication of the finished product to be sold. Sales of and the storage or use of materials, tools and fuel or any substitute therefor, when such products are used

12-412 (34) provided for a full exemption from the sales and use tax for "machinery used *directly* in a manufacturing production process. . . ."[10] (Emphasis added.) The definition of " 'machinery' " in § 12-412 (34) clarified that it "includes machinery used *exclusively* to control or monitor an activity occurring during the manufacturing production process and machinery used *exclusively* during the manufacturing production process to test or measure materials and products being manufactured . . . ." (Emphasis added.)

Several aspects of the exemptions in § 12-412 (18) and (34) are significant for our interpretation of the scope of the aircraft manufacturing exemption. First, neither subsection exempts equipment used in the manufacturing process. Second, the exemptions in § 12-412 (18) and (34) consistently draw a distinction between items used directly in the manufacturing process and items used only indirectly in connection with manufac-

directly in the furnishing of power to an industrial manufacturing plant or in the furnishing of gas, water, steam or electricity when delivered to consumers through mains, lines or pipes."

[10] General Statutes § 12-412 (34) exempts from the sales and use tax: "Sales of and the storage, use or other consumption of machinery used directly in a manufacturing production process. The word 'machinery' as used in this subsection means the basic machine itself, and includes all of its component parts and contrivances, such as belts, pulleys, shafts, moving parts, operating structures and equipment or devices, which component parts and contrivances are used or required to control, regulate or operate the machinery or to enhance or alter its productivity or functionality, whether such component parts and contrivances are purchased separately or in conjunction with such machine and all replacement and repair parts for the basic machine or for its component parts and contrivances, whether such replacement or repair parts are purchased separately or in conjunction with such machine. For the purposes of this subsection, 'machinery' includes machinery used exclusively to control or monitor an activity occurring during the manufacturing production process and machinery used exclusively during the manufacturing production process to test or measure materials and products being manufactured but shall not include office equipment or data processing equipment other than numerically controlled machinery used directly in the manufacturing process."

turing. To qualify for an exemption under § 12-412 (18), materials, tools and fuel must have been used in the "actual fabrication" of the finished product to be sold. This language indicates the legislature's intent to limit these exemptions to items that are used directly in connection with manufacturing. Similarly, to be exempt under § 12-412 (34), machinery must have been used directly in the manufacturing production process. The term "machinery" is limited to machinery that is used exclusively either to control or monitor an activity occurring during the manufacturing process or, during the manufacturing production process, to test or measure materials and products being manufactured. The application of the exemptions in § 12-412 (18) and (34), therefore, is directly limited by the manner in which the items are used. If their use is for actual fabrication or is directly connected with and exclusively in a manufacturing production process, these exemptions apply; otherwise, they do not. See, e.g., *Plastic Tooling Aids Laboratory, Inc.* v. *Commissioner of Revenue Services*, 213 Conn. 365, 371, 567 A.2d 1218 (1990) (rejecting taxpayer claim that design computer qualified for exemption under § 12-412 [34] because functions performed by computer were "preliminary to the manufacturing process, rather than 'used directly' therein").

Neither § 12-412 (18) or (34), both of which predated the MRA's definition of "manufacturing," define the terms "manufacturing" or "fabrication." In interpreting § 12-412 (34), however, this court previously had construed the meaning of the term "manufacturing." Relying on changes in agency regulations narrowing the scope of the definition of manufacturing, our interpretation of the term has evolved from a broad construction; see *Ziperstein* v. *Tax Commissioner*, 178 Conn. 493, 499–500, 423 A.2d 129 (1979) (Dairy Queen establishment entitled to exemption pursuant to § 12-412 [34] because process of transforming, sugar, corn syrup and

other items into ice milk constituted manufacturing); to a more narrow construction. *Connecticut Water Co.* v. *Barbato*, 206 Conn. 337, 343, 537 A.2d 490 (1988) (water treatment plant's conversion of raw water to potable water not manufacturing). In *Connecticut Water Co.*, we relied on § 12-426-11b (a) (10) of the Regulations of Connecticut State Agencies,[11] which defined manufacturing as "the performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired for sale in the regular course of business by the manufacturer. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, nature and use. Operations such as compounding or fabricating are [illustrative] of the types of operation which may result in such a change. Manufacturing is an activity which shall occur solely at an industrial plant." (Internal quotation marks omitted.) Id., 343 n.6. We held that this definition had superseded the broader, " 'enhanced value and use' " definition of manufacturing that we previously had set forth in *Ziperstein.* Id., 344 n.7. We subsequently applied the more narrow definition to conclude that a plaintiff's design

[11] In April, 1991, § 12-426-11b of the Regulations of Connecticut State Agencies was repealed and § 12-412 (34)-1 of the Regulations of Connecticut State Agencies took effect. Although *Connecticut Water Co.* relied on § 12-426-11b of the regulations, our reasoning in that case still applies because the definition of manufacturing in § 12-426-11b of the regulations, as we discuss subsequently in this opinion, is not substantially distinct from the definition of manufacturing in § 12-412i. In addition, the current definition of manufacturing in § 12-412 (34)-1 of the regulations retains the essential language that the court focused on in *Connecticut Water Co.*, namely, that manufacturing involves a change in " 'form, composition or character' " such that there has been a transformation of property into a different product having a distinctive " 'name, nature and use' "; *Connecticut Water Co.* v. *Barbato*, supra, 206 Conn. 343. The current regulatory provision builds on that essential language by adding numerous examples and details. See Regs., Conn. State Agencies § 12-412 (34)-1.

computer did not qualify for an exemption under § 12-412 (34) because the plaintiff had failed to prove that there was a direct connection between the design computer and "a process that results in the substantial transformation of the form, composition or character of personal property." (Internal quotation marks omitted.) *Plastic Tooling Aids Laboratory, Inc.* v. *Commissioner of Revenue Services*, supra, 213 Conn. 371.

Against that backdrop, the legislature passed the MRA, which phased in a 50 percent exemption from the sales and use tax for materials, tools, fuel, machinery and equipment used in connection with general manufacturing. In contrast to § 12-412 (18) and (34); see footnotes 9 and 10 of this opinion; the MRA does not require that exempt items must be used "directly" or "exclusively" in a manufacturing production process or in the "actual fabrication" of a finished product. The MRA treats materials, tools and fuel together, applying the partial exemption to those items if they either become an ingredient or component part of a product to be sold or used, or are used "in the manufacturing, processing or fabricating of products to be sold, in any process preparatory or related thereto or in the measuring or testing of such products . . . ." General Statutes § 12-412i (a) (1). Thus, pursuant to the MRA, materials, tools and fuel qualify for the partial exemption provided their use is "in any process preparatory or related to" manufacturing. In sum, although the exemption under the MRA is only partial, the scope has been significantly broadened in comparison with the exemptions set forth in § 12-412 (18) and (34).

The MRA applies a similarly broad partial exemption to machinery and equipment. Under § 12-412 (34), machinery is exempt only if "used directly in a manufacturing production process," and equipment is not exempt at all. Moreover, " '[m]achinery' " in § 12-412 (34) includes "machinery used *exclusively* to control or

monitor an activity occurring during the manufacturing production process and machinery used *exclusively* during the manufacturing production process to test or measure materials and products being manufactured . . . ." (Emphasis added.) Under the MRA, however, both machinery and equipment are partially exempt if they are used "*primarily* in the process of manufacturing, processing or fabricating tangible personal property . . . ." (Emphasis added.) General Statutes § 12-412i (a) (2). The four ways in which machinery and equipment may satisfy the requirement that their use be primarily in the process of manufacturing, processing or fabricating tangible personal property demonstrates that machinery and equipment need not be used directly in manufacturing in order to qualify for the partial exemption. Specifically, machinery and equipment are eligible for the partial exemption if their use: (A) is for research and development, measuring or testing with respect to or in the furtherance of manufacturing tangible personal property; (B) occurs during some stage of the manufacturing process; (C) is primarily to maintain or repair any machinery or equipment that falls under (A) or (B); or (D) is primarily for metal finishing.[12] General Statutes § 12-412i. In summary, for purposes of the partial exemption, the exclusive use requirement for machinery was relaxed to primary use, equipment was for the first time eligible for an exemption, and *direct* use in manufacturing was not required with respect to both machinery and equipment.

Significantly, although the MRA has a much broader scope than § 12-412 (18) and (34), the definition of "manufacturing" in the MRA is not substantially distinct

---

[12] Although the MRA does have a broad scope, it does not grant the partial exemption to *every* process undertaken by a manufacturer as part of its business operations. For example, the exemption expressly does not apply to machinery or equipment used "primarily in administration, general management, sales or in any other activity which does not constitute manufacturing . . . ." General Statutes § 12-412i (a) (2) (D).

from the regulatory definition that we relied on in *Connecticut Water Co.* v. *Barbato*, supra, 206 Conn. 343 n.6, to construe § 12-412 (34) narrowly. Both former § 12-426-11b (a) (10) and § 12-412 (34)-1 of the Regulations of Connecticut State Agencies describe the process of manufacturing as "an integrated series of operations" that changes or transforms personal property into a new "form, composition or character" that has a distinctive "name, nature and use." The MRA describes manufacturing as "the activity of converting or conditioning tangible personal property by changing the form, composition, quality or character of the property for ultimate sale at retail . . . ." General Statutes § 12-412i (b) (1). The minor differences in language appear inconsequential.[13] Both the statutory and the regulatory definitions provide that manufacturing involves changing the form, composition or character of personal property for purposes of sale. Put simply, both definitions describe the actual process involved in making a product and relate to activities that occur directly on an assembly line or on the production floor.[14] This reading of the definition of manufacturing in the MRA is consistent with the commissioner's position that manufacturing is confined to the actual changing of the form, composition, quality or character of tangible personal property to be sold. It cannot be, therefore, that the broader scope of the MRA signifies an intended change in the actual definition of manufacturing.[15]

[13] Although the current regulation builds on the basic description of manufacturing by adding further detail; see Regs., Conn. State Agencies § 12-412 (34)-1; the minor differences in the basic description of manufacturing are inconsequential.

[14] The closely related concepts of " 'fabricating' " and " 'processing' " also are defined in very traditional terms, respectively, as "to make, build, create, produce or assemble components or tangible personal property so that they work in a new or different manner"; General Statutes § 12-412 (b) (2); and "the physical application of the materials and labor necessary to modify or change the characteristics of tangible personal property . . . ." General Statutes § 12-412i (b) (3).

[15] Indeed, it may be argued that the regulatory definition suggests a broader range of activities because it refers to manufacturing as involving "an inte-

The answer is fairly simple—the broader scope of the MRA does not stem literally from a broader or different definition of manufacturing itself, but rather from a change in the required nexus between manufacturing and exempt items. A key distinction between the use of the term "manufacturing" in the MRA and its use in § 12-412 (34), as well as the use of the term "fabrication" in § 12-412 (18), is that, in order for the partial exemption of the MRA to apply, there is no requirement that any of the five types of items be used *directly* in a manufacturing process or in the *actual fabrication* of the finished product. Instead, it is sufficient if an item is used in a process related to or preparatory to manufacturing. Undoubtedly, research and development intended to be applied to or integrated into the manufacturing process is a process related to or preparatory to manufacturing. Accordingly, even for machinery and equipment, which must have manufacturing as their primary use, that requirement would be satisfied if those items are used for research and development, or any of the remaining three uses specified in the MRA. See General Statutes § 12-412i (a) (2). That change was accomplished by omitting any reference to a "direct" connection to manufacturing or to "actual" fabrication. See *Viera* v. *Cohen*, 283 Conn. 412, 431, 927 A.2d 843 (2007) ("Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them." [Internal quotation marks omitted.]).

grated series of operations . . . ." Regs., Conn. State Agencies § 12-412 (34)-1.

We must now apply this understanding of manufacturing to the aircraft manufacturing exemption and determine the nature of the nexus that is required between manufacturing and materials, tools, fuel, machinery and equipment in order to trigger the aircraft manufacturing exemption. As we stated earlier in this opinion, the meaning of the term manufacturing is significant in discerning the scope of the aircraft manufacturing exemption on two levels. First, the aircraft manufacturing exemption applies only to materials, tools, fuel, machinery and equipment that are used in an aircraft manufacturing facility, which is "that portion of the plant, building or other real property improvement used for the manufacturing of aircraft or aircraft parts . . . ." General Statutes § 12-412 (78) (B). Nothing in the definition of "aircraft manufacturing facility" indicates that such a facility is restricted only to that portion of a building where "actual fabrication" or activities directly associated with manufacturing take place. In contrast to § 12-412 (34), the aircraft manufacturing exemption does not require a direct nexus with manufacturing in order for the exemption to operate. Instead, the definition of "aircraft manufacturing facility" employs language that is more analogous to that used in the MRA, indicating that the legislature intended that an indirect connection with manufacturing would suffice. If we are to accord meaning to the use of the word "direct" in § 12-412 (34), its absence must also have meaning. See *Viera* v. *Cohen*, supra, 283 Conn. 431. Accordingly, an "aircraft manufacturing facility" would include those portions of the facility where related activities such as research and development and measuring and testing take place.

Second, the meaning of manufacturing is significant in that an additional element is required of machinery and equipment—they must have manufacturing as their predominant use. This language is similar to that

employed in the MRA, which requires that machinery and equipment have manufacturing as their primary use. Nothing in either statute, however, specifies that the predominant or primary use must be in direct connection with manufacturing. Therefore, we read the aircraft manufacturing exemption consistently with the MRA. That is, the "predominant use" requirement of the aircraft manufacturing exemption; General Statutes § 12-412 (78) (A) (ii); is satisfied if the machinery and equipment are used in research and development with respect to or in furtherance of manufacturing tangible personal property.

Although we conclude that the most persuasive reading of the plain language of the aircraft manufacturing exemption is that its intended scope is the same as the scope of the MRA—namely, that both exemptions extend to items that are used in activities that are indirectly connected to manufacturing—the language of the aircraft manufacturing exemption is not plain and unambiguous. In drafting the aircraft manufacturing exemption, the legislature employed very unusual language, restricting the application of the exemption by the *location* in which items are used within a facility owned by an aircraft manufacturer. The legislature could have clearly expressed its intent by stating simply that aircraft manufacturers were entitled to a 100 percent exemption for items that would otherwise be entitled to a 50 percent exemption pursuant to the MRA. That the legislature did not do so is sufficient to render the aircraft manufacturing exemption ambiguous. Accordingly, we look to extratextual sources for further guidance. In determining legislative intent, we are mindful of the three presumptions that we have already recited in this opinion, namely, that we construe tax exemptions strictly and resolve any ambiguities against the taxpayer, who bears the burden of showing an error in an adverse assessment. See *Achillon Pharmaceuti-*

*cals, Inc.* v. *Law,* supra, 291 Conn. 532 n.8. These presumptions do not mean that the mere fact that a statutory exemption is not plain and unambiguous necessitates the conclusion that that exemption does not apply. They are presumptions and function as starting points. Our goal remains, as always, to determine the intent of the legislature.

Mindful of these presumptions, we turn to the extratextual sources. We begin with the legislative history of the MRA. Certain remarks made during the floor debate concerning the MRA; see Public Acts 1992, No. 92-193; which indicate that the legislature perceived manufacturing as encompassing a process of integrated functions rather than a series of readily separable and distinct steps, are helpful in discerning the legislative intent with respect to the scope of the aircraft manufacturing exemption. The legislation was intended to benefit all manufacturers by providing some relief from "the anticompetitive tax burden . . . ." 35 H.R. Proc., Pt. 19, 1992 Sess., p. 6390, remarks of Representative Thomas S. Luby. The legislation also was intended to modernize the definition of manufacturing particularly in light of the recognition that some of the procedures integral to the manufacturing process in high technology industries would not satisfy the requirements in existing exemptions that a direct connection be established. Id., p. 6391, remarks of Representative Luby ("[e]ssentially, what this bill does is it modernizes the definition [of manufacturing] and in a sense, takes . . . higher technological applications in manufacturing that may not be directly connected to the manufacturing equipment and . . . brings them within . . . certain tax exemptions and breaks"). During the discussion of the bill, it became clear that, in expanding the scope of exemptions for manufacturers, the legislature particularly had in mind research and development as it is used in the manufacturing process of high technology

industries. Id., p. 6405, remarks of Representative Glenn Arthur (The intent in modernizing the definition was to "[include] those kinds of equipment and machinery and measuring devices that are used in high technology manufacturing processes. This is essential, especially for [research] and [development] and quality testing machinery.").

One would expect, based on these remarks, that the definition of manufacturing in the MRA would reflect this intent to broaden the scope of tax exemptions allowed to manufacturers. As we already have stated, however, the actual definition of manufacturing in the MRA is substantially the same as the one that we had applied in construing § 12-412 (34) narrowly. The change alluded to in the legislative history is not literally in the definition itself, but in how direct the nexus between an item's use and manufacturing must be in order to trigger the aircraft manufacturing exemption. That change reflects the legislature's understanding that manufacturing in high technology industries involves a much more complicated, nuanced and interconnected process, in which activities such as research and development are integral to the actual making of the product.[16]

---

[16] The processes employed by the plaintiff in manufacturing aircraft illustrate the degree to which research and development are integral to the manufacturing process in high technology industries such as aircraft manufacturing. Specifically, the plaintiff utilized a system known as "integrated product development teams" also known as "integrated product teams." These multidisciplinary teams have as their goal the integration of the various stages of manufacturing a finished product, including research, engineering, design, product development and manufacturing. As the stages of production progress, different aspects of production dominate, and the team's composition evolves, but the process is a very fluid and interconnected one, defying the stark divisions between actual fabrication and research and development that characterize more traditional and dated understandings of the manufacturing process.

Although we consider the plaintiff's manufacturing process to present an apt illustration of the integrated nature of manufacturing in high technology industries, we emphasize that our conclusion that the plaintiff is entitled to the claimed exemption pursuant to the aircraft manufacturing exemption

Moreover, the aircraft manufacturing exemption was enacted within a few months after the MRA, very soon after the legislature had decided to modernize the definition of manufacturing. That the legislature was mindful of that change in its understanding of manufacturing and had that change specifically in mind in creating the new aircraft manufacturing exemption is reflected in the legislative history of Public Acts, Spec. Sess., May, 1992, No. 92-17. In discussing the aircraft manufacturing exemption, Senator Gary A. Hale requested a clarification that the exemption was "not intended to suggest that activities that already meet the *current manufacturing definition* are not exempt."[17] (Emphasis added.) 35 S. Proc., Pt. 13, Spec. Sess., May, 1992, p. 4521. Senator William A. DiBella confirmed that the statement was an accurate understanding of the aircraft manufacturing exemption. Id., p. 4522. The exchange reveals that the legislature recognized that the treatment of manufacturing in the General Statutes at that time did not accurately reflect modern manufacturing processes, and the aircraft manufacturing exemption resulted from that change in the understanding of manufacturing. The legislative history, therefore, further supports our conclusion that the legislature intended in the aircraft manufacturing exemption to extend the full exemption not only to items that are used in direct

is not grounded on the plaintiff's utilization of "integrated product development teams." Rather, we rely on the legislature's intent to extend the aircraft manufacturing exemption to items used in processes indirectly connected with manufacturing. As we discuss in part III of this opinion, it was established at trial and conceded before this court that the items would have been partially exempt pursuant to the MRA—that is sufficient for the plaintiff, an aircraft manufacturer operating an aircraft manufacturing facility in this state, to be eligible for the full exemption for those items pursuant to the aircraft manufacturing exemption.

[17] In addition to the aircraft manufacturing exemption at issue in this appeal, several other exemptions benefiting the aircraft manufacturing industry were proposed during the 1992 May Special Session, including exemptions related to aviation fuel, replacement parts and aircraft repair services. See Public Acts, Spec. Sess., May, 1992, No. 92-17, §§ 74 through 76.

connection with the manufacturing process, but also to items that are used in processes that have at least an indirect connection with manufacturing, including processes such as related research and development.

The commissioner argues that the aircraft manufacturing exemption exempts only items used directly in manufacturing. This interpretation of the statute is inconsistent both with the plain language of the aircraft manufacturing exemption and the statutory scheme. First, it is clear from the plain language of the statute that the manner in which materials, tools and fuel are used is irrelevant to the application of the aircraft manufacturing exemption to those items. In order to qualify for the aircraft manufacturing exemption, these items need only be used by an aircraft manufacturer in an aircraft manufacturing facility. As we stated earlier in this opinion, it does not matter *how* these items were used, but rather *where* they were used. Second, interpreting the aircraft manufacturing exemption to apply only to materials, tools, fuel, equipment and machinery that are used *directly* in manufacturing fails to give effect to the legislature's omission of that language in the aircraft manufacturing exemption.

The commissioner's alternate claim is that, although materials, tools and fuel are exempt regardless of how they are used, the definition of "aircraft manufacturing facility" must be interpreted to require a direct connection to manufacturing in order to trigger the aircraft manufacturing exemption. In other words, the commissioner claims that only those portions of the plant, building or other real property improvement where activities directly connected with manufacturing occur constitute the "aircraft manufacturing facility" for purposes of the aircraft manufacturing exemption. Under this interpretation, the phrase "aircraft manufacturing facility" would not include areas of the plaintiff's Stratford facility where related research and development, but no

activities directly connected with manufacturing, occur. Accordingly, materials, tools, fuel, machinery or equipment used exclusively in those areas would not qualify for the aircraft manufacturing exemption.

Consistent with our conclusion that the language of the aircraft manufacturing exemption is not plain and unambiguous, we acknowledge that the commissioner's interpretation, that the aircraft manufacturing exemption limits the scope of "aircraft manufacturing facility" only to those portions of the facility where activities directly connected with manufacturing occur, although not persuasive, is not an implausible reading of the statute. As the commissioner points out, her interpretation would not render the aircraft manufacturing exemption meaningless. That is, under the commissioner's interpretation, the plaintiff would be able to claim exemptions under the aircraft manufacturing exemption to which it otherwise would not be entitled. Specifically, materials, tools and fuel used for research and development purposes would be exempt as long as they were used within the portion of the facility where actual fabrication of aircraft or aircraft parts take place. Additionally, equipment that never had qualified for a full exemption would be eligible under the aircraft manufacturing exemption if its predominant use was directly connected to manufacturing. Finally, aircraft manufacturers would gain an extra benefit with regard to machinery—under § 12-412 (34), machinery was eligible for an exemption only if it was used exclusively and directly in a manufacturing production process. Under the commissioner's interpretation of the aircraft manufacturing exemption, although the use must be directly in a manufacturing process, it is sufficient if that use is the primary one. The commissioner contends that this interpretation is the most consistent with the definition of manufacturing in the MRA.

The commissioner's position that the scope of the aircraft manufacturing exemption is limited by the definition of manufacturing in the MRA, however, ignores the fact that the same definition does not function as a limit on the scope of the MRA itself. Instead, the legislature chose to extend the application of the partial exemption provided by the MRA by omitting the requirement that there be a direct connection to manufacturing in order for the partial exemption to apply. It would be incongruous to read the words "direct" and "actual" into the definition of manufacturing for purposes of the aircraft manufacturing exemption, but not for the MRA, particularly in light of the legislative history indicating that the legislature intended for the aircraft manufacturing exemption to have the same approach to the meaning of manufacturing as had been employed in the MRA. See 35 H.R. Proc., supra, p. 6405; 35 S. Proc., supra, p. 4521. Although we are mindful of the precept that we should construe exemptions narrowly, and are aware that our interpretation of the statute sweeps more broadly than that advocated by the commissioner, we must adhere to the first and foremost guiding principle of statutory interpretation, that is, our task is always to discern the intent of the legislature, which in the close question presented in this appeal, is clarified by the legislative history of the statutes.

The commissioner also contends that our interpretation renders meaningless the distinction between materials, tools and fuel, on the one hand, and machinery and equipment, on the other. We disagree. The distinction between the two categories of items is the same in both the MRA and the aircraft manufacturing exemption. In both statutes, machinery and equipment must satisfy the extra requirement that their primary or predominant use be in manufacturing. No such restriction exists for materials, tools and fuel. Although it is possible that the distinction will in reality yield the result that the

two categories receive closely similar treatment, it will not necessarily result in the two categories being treated identically.

### III

Finally, we address the commissioner's alternative claim that the plaintiff did not provide sufficient evidence to meet its burden of establishing that all of the disputed items qualified for the aircraft manufacturing exemption. We disagree.

We review the commissioner's claim using the clearly erroneous standard of review. "Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 303–304, 823 A.2d 1184 (2003).

The plaintiff bore the burden of proving at trial that the commissioner's deficiency assessment was in error. Id., 302. In satisfying that burden, the plaintiff was required to "present clear and convincing evidence that the assessment [was] incorrect or that the method of audit or amount of tax assessed was erroneous or unreasonable." Id. Pursuant to the aircraft manufacturing exemption, in order to prove that the commissioner's assessment was incorrect, the plaintiff bore the burden of proving that: (1) it was an aircraft manufacturer in this state; (2) the claimed items were used in an aircraft manufacturing facility as defined by the aircraft manu-

facturing exemption; and (3) for machinery and equipment, that their predominant use was in manufacturing. There was no dispute that the plaintiff is an aircraft manufacturer in this state. As to the remaining two elements, the commissioner effectively conceded that the items at issue in the present case satisfy these elements by concluding that the plaintiff was entitled, in accordance with the commissioner's interpretation of the statutory scheme, to a 50 percent exemption for all 3500 items pursuant to the MRA. Moreover, the commissioner made the same concession in her brief to this court, stating that she had granted the partial exemption to the plaintiff for the disputed items because in her view those items "were used in support of manufacturing." As we have concluded in this opinion, the legislature intended through the aircraft manufacturing exemption to grant a 100 percent exemption for aircraft manufacturers with respect to items that would otherwise qualify for the 50 percent exemption pursuant to the MRA. Accordingly, the commissioner's conclusion that the items would be entitled to the exemption, and her continued reliance on that position in argument to this court, operates as a concession that under our interpretation of the aircraft manufacturing exemption those items qualify for the full exemption.

The judgment is affirmed.

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.