HARBOUR POINTE, LLC *v.* HARBOUR LANDING CONDOMINIUM ASSOCIATION, INC., ET AL.
(SC 18566)
(SC 18567)

Rogers, C. J., and Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

Argued September 22, 2010—officially released February 22, 2011

*Richard J. Buturla*, with whom were *Brian A. Lema* and *Anthony V. Avallone*, for the appellants (defendants).

*Richard E. Castiglioni*, with whom, on the brief, were *Jonathan J. Kelson* and *Paul A. Sobel*, for the appellee (plaintiff).

*Opinion*

McLACHLAN, J. This appeal involves the proper interpretation of the declaration[1] for Harbour Landing,

---

[1] A declaration is an instrument recorded and executed in the same manner as a deed for the purposes of creating a common interest community. General Statutes § 47-220.

"[T]he declaration operates in the nature of a contract, in that it establishes the parties' rights and obligations . . . ." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898 (2005).

The original declaration was recorded by Harbour Landing Development Corporation in the New Haven land records on July 19, 1983. The declaration was later amended three times—in 1986, 1988 and 2002. For convenience, we refer to the original declaration and all amended declarations collectively as the "declaration."

an expandable condominium[2] (condominium) created pursuant to the Condominium Act of 1976 (act), General Statutes § 47-68a et seq. The defendants, Harbour Landing Condominium Association, Inc. (association),[3] and its president, David Potter, appeal[4] from the trial court's judgment in favor of the plaintiff, Harbour Pointe, LLC (Harbour Pointe). The defendants claim that the trial court improperly concluded that the declaration grants Harbour Pointe access and utility easements over the condominium property. The dispositive issue in this appeal is whether the declaration clearly and unambiguously provides that easements are terminable only if the condominium adds certain properties. We conclude that the declaration does so provide, and, accordingly, we affirm the judgment of the trial court.

The record reveals the following facts. The declaration for the condominium, which was recorded in the New Haven land records by Harbour Landing Development Corporation (declarant), sets out five different phases for expansion and development, each phase comprising a different parcel of land as described on a New Haven land records map (map). When added together, the five phases comprise approximately 9.4173 acres. Currently, the condominium is located on the property described as phases I and II on the map, and Harbour Pointe owns the adjacent property, described as phases III, IV and V on the map.[5]

---

[2] An " '[e]xpandable condominium' " is "a condominium to which additional land may be added in accordance with the provisions of the declaration . . . ." General Statutes § 47-68a (y).

[3] The association is a separate entity from the condominium. The Harbour Landing Development Corporation was the original declarant and created the condominium; the association is the unit owners' association for the condominium. The association is a nonstock corporation organized and existing under the laws of this state.

[4] The defendants appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] When the original declaration was recorded in 1983, the declarant owned all five phases of land, but made only phase I subject to the condominium

With respect to the contemplated expansion of the condominium, the declaration provides that the remaining phases, or any portion of the remaining phases, can be added to the condominium at different times. The declaration also provides, however, that there is "no assurance of, or limitation on" the expansion of the condominium to add the remaining phases within the seven year period from the date of recording of the declaration.

Recognizing the uncertainty of expansion, article IIIa of the declaration grants to phases II, III, IV and V access and utility easements over phase I. These easements continue "until and unless" each phase is added to the condominium. When the original declaration was recorded in 1983, only phase I was subject to the easements created by the declaration. After the condominium added phase II, however, the declaration was amended to reflect the extension of the easements over phase II. On July 19, 1990, the condominium's right to expand expired. Harbour Pointe, therefore, is comprised of phases III, IV and V, and has not been added to the condominium.

The dispute between the parties began after Harbour Pointe hired a contractor to install utility lines over the easements and the contractor attempted to use Harbour Close, a private roadway on the condominium property. The association denied the contractor access to the condominium property, put up "No Trespassing" signs facing Harbour Pointe and informed Harbour Pointe that it would treat the use of the alleged easements as a trespass.

declaration. It later mortgaged phases III, IV and V to Bank of Boston Connecticut. Subsequently, it defaulted on its mortgage, and the bank foreclosed on those properties, together with the appurtenant easement rights. In December, 2006, as a result of the foreclosure, Harbour Pointe acquired title to phases III, IV and V.

In 2007, Harbour Pointe brought the present action seeking, inter alia, injunctive relief enjoining the defendants from interfering with Harbour Pointe's use and enjoyment of the access and utility easements, and an order quieting title to the easements pursuant to General Statutes § 47-31. At the commencement of trial, the parties stipulated to underlying facts, including a description of the parties, the date of the recording of the declaration, and the location of the easements. They further stipulated that "[t]he right to expand the . . . [c]ondominium expired on July 19, 1990; accordingly, no more land or units may be added and the . . . [c]ondominium is fully expanded." Harbour Pointe argued that article IIIa of the declaration clearly and unambiguously reserved the easements in favor of phases III, IV and V, and that the easements had not been extinguished. The defendants, however, maintained that, upon the consideration of every article of the declaration and the circumstances surrounding the condominium's creation, the duration of the easements was ambiguous. The defendants contended that an alternate, reasonable construction of the declaration was that, because the condominium was "fully expanded," meaning its expansion rights had expired, the easements had terminated.

On January 23, 2009, the trial court rejected the defendants' claims, concluding that, because the language in the declaration was clear and unambiguous, the easements granted to Harbour Pointe "can only be extinguished . . . if the land described as phases III, IV and V were used to expand the . . . condominium . . . . That condition has not been met and therefore the easement rights granted remain in full force and effect." In accordance with this reasoning, the trial court permanently enjoined the defendants from interfering with Harbour Pointe's use and enjoyment of the easements. The court also issued an order quieting title to the easements in Harbour Pointe, and terminated any auto-

matic stay of execution. The defendants filed separate appeals from the trial court's judgment, which were consolidated by the Appellate Court and transferred to this court.

The defendants contend that the trial court improperly concluded that the declaration clearly and unambiguously provides that the easements will expire only when the remaining phases are added to the condominium. Accordingly, the defendants argue, the declaration should be construed against the declarant[6] and interpreted consistently with the defendants' contention that the easements have expired. We disagree.

The resolution of this issue turns on the interpretation of the declaration. "Because the [condominium] declaration operates in the nature of a contract, in that it establishes the parties' rights and obligations, we apply the rules of contract construction to the interpretation of [the declaration]." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898 (2005). "It is well estab-

---

[6] The defendants argue that "since the [association] is the grantee of the [e]asement, any ambiguity contained in the [d]eclaration must be construed against [Harbour Pointe], as successor to the . . . [d]eclarant." Because the declaration is unambiguous, whether Harbour Pointe is a successor to the declarant is irrelevant.

Even if we were to conclude that the declaration language is ambiguous, we would not view the association as the grantee of the easements. Article IIIa of the declaration granted the easements "for the benefit of the remainder of the land described as [p]hase II, [p]hase III, [p]hase IV and [p]hase V . . . ." Furthermore, the defendants do not explain why we should consider Harbour Pointe to be a successor to the declarant. The mere fact that Harbour Pointe owns land that previously belonged to the declarant does not compel us to conclude that Harbour Pointe is a successor of the declarant. Pursuant to § 47-68a (m), successors of a declarant include parties "who acquire fee simple title to condominium units or title to leasehold condominium units and who come to stand in the same relation to the condominium as their predecessors . . . ." While the dissent points out that the unit purchasers played no role in drafting the declaration, Harbour Pointe also played no such role and, indeed, had even less voice than the association in drafting the declaration.

lished that [w]here there is definitive contract language, *the determination of what the parties intended by their contractual commitments is a question of law. . . .* It is axiomatic that a matter of law is entitled to plenary review on appeal." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 162, 989 A.2d 1060 (2010).

"In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . . We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . Where the language is unambiguous, we must give the contract effect according to its terms. . . . Where the language is ambiguous, however, we must construe those ambiguities against the drafter. . . . This approach corresponds with the general rule that [a]ny ambiguity in a declaration of condominium must be construed against the developer who authored the declaration." (Citations omitted; internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC,* supra, 273 Conn. 734–35.

Furthermore, "[a] contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the

language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) Id., 735. With these principles in mind, we turn to the defendants' claims.[7]

---

[7] The dissent states that "the [majority assumes] that a condominium declaration, like other types of contracts, is to be interpreted in the *first instance solely* based on the intent of the drafting parties, as expressed in the language of the declaration itself." (Emphasis added.) This mischaracterizes our approach to condominium declarations.

We do not *begin* to interpret a condominium declaration by reviewing *only* the language of the declaration to the exclusion of the language of the act. Condominium declarations must comply with the act, and we interpret them in accordance with contract principles. We acknowledge that "compliance with the . . . act is a condition precedent to attaining condominium legal status . . . ." (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 592, 830 A.2d 164 (2003). It is also well settled that "[b]ecause the [condominium] declaration operates in the nature of a contract, in that it establishes the parties' rights and obligations, we apply the rules of contract construction to the interpretation of [the declaration]." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 273 Conn. 734; see also *Southwick at Milford Condominium Assn., Inc.* v. *523 Wheelers Farm Road, Milford, LLC*, 294 Conn. 311, 313 n.3, 984 A.2d 676 (2009).

The dissent, however, begins to interpret the declaration by reviewing the language of the act to the exclusion of the declaration. Although it concedes that "the resolution of this appeal hinges on the proper interpretation of the easement provisions of the declaration," the dissent, in fact, reviews the legislative history of the act without considering the language of the declaration. The dissent states that "before analyzing the declaration itself, I briefly consider the relevant provisions of the act . . . ."

The defendants do not claim that the act is ambiguous. Nor do they claim that any ambiguity in the act entitles them to prevail. Their primary claim, which we address, is that the declaration is ambiguous and should be construed against Harbour Pointe.

There is no need to review legislative history. General Statutes § 47-70 (d) (1) expressly permits a condominium declaration to reserve an easement "which land developers commonly convey . . . for the purpose of bringing utilities . . . or . . . access to or through the condominium . . . ." Moreover, the dissent tacitly admits that its approach is improper because it finds it necessary to provide an argument against construing condominium declarations in accordance with contract principles. In other words, the

Article IIIa of the declaration, entitled "Declaration of Easements," deals specifically and exclusively with the creation and terms of the easements, and "establish[es] . . . for the benefit of the remainder of the land described as [p]hase II, [p]hase III, [p]hase IV and [p]hase V . . . (1) an easement for ingress and egress, by vehicles or on foot, in, to, upon and over the driveways and roadways in [p]hase 1, including Harbour Close, and . . . (2) rights to install, connect with, make use of . . . utility lines . . . over or under the driveways or other [c]ommon [e]lements of [p]hase I . . . . Said easements shall continue *until and unless* that portion of the remaining land is added to . . . [the] [c]ondominium." (Emphasis added.) In other words, article IIIa gave to "the remainder of the land," meaning phases III, IV and V, which are now owned by Harbour Pointe, easements that "shall continue until and unless" the condominium "add[s]" those properties. The only reasonable interpretation of article IIIa is that, but for the addition of the remaining phases to the condominium, Harbour Pointe enjoys easement rights; the addition to the condominium is a precondition to the termination of the easements.[8] Because the addition

---

dissent argues that, if we must interpret the declaration by reviewing its language, we should not apply contract principles because condominium declarations are distinct from "more conventional forms of contracts . . . ." This statement clearly departs from *Cantonbury Heights Condominium Assn., Inc.* Furthermore, the dissent mischaracterizes the easement reservation in the declaration as a "novel method of saddling the condominium buyers with . . . unexpected and arguably unreasonable costs . . . ." There was no finding by the trial court regarding the costs associated with the easements and, certainly, no finding that any such costs were unreasonable. Indeed, the public offering statement expressly disclosed that the units were subject to "easements for access and utilities . . . in favor of the additional land as set forth in [a]rticle IIIa of the [d]eclaration."

[8] The trial court characterized the easement reservation in the declaration as "creat[ing] a condition subsequent that expressly limits the duration of the easement[s]." The question of whether the easements are determinable, defeasible or subject to condition subsequent is not before this court, and we do not address it at this time.

did not occur, and the condominium's expansion rights expired in 1990, Harbour Pointe enjoys easement rights.

Language in article V of the declaration supports this interpretation. Article V, entitled "Description of Buildings and Units," provides a broad depiction of the structures on the land—the gatehouse, residential units, parking garage, clubhouse, swimming pools, boardwalks, storage bins, flooring, kitchen equipment and available utilities. Within this context, article V provides in relevant part: "The [d]eclarant has reserved an easement in favor of the additional land for ingress, egress and for utility installations across [p]hase I and future phases, which will continue *until and unless* the [c]ondominium is *fully expanded*." (Emphasis added.) Under article V of the declaration, "[i]f the [c]ondominium is fully expanded . . . the maximum number of [u]nits to be sold or rented will be [300] [u]nits contained on a 9.4174 acre site." The declaration provides that "[t]he [300] [u]nits will be offered in five phases . . . [and] [t]he [*d*]*eclarant* intends to sell all of the [u]nits . . . ." (Emphasis added.) Put another way, the condominium is "fully expanded" within the meaning of the declaration, when it includes 300 units on a site of approximately nine acres, and encompasses all five phases of the development. Until that time, the easements continue. This limitation is consistent with the statement in article IIIa that the easements continue "until and unless" the phases are "added"; for the easements to terminate, both articles require the condominium to add all phases. As we have already noted in this opinion, the condominium's right to expand has expired. Accordingly, the easements continue. We thus conclude, based on the consistent language of articles IIIa and V, that the declaration clearly and unambiguously grants access and utility easements that terminate only if the condominium adds all of the phases.

The defendants argue that the declaration is ambiguous because article V directly contradicts article IIIa. While the defendants agree that article IIIa provides that the easements will terminate only if the condominium adds the remaining phases, they contend that article V provides that the easements will terminate when the association is "fully expanded." The defendants further claim that the phrase "fully expanded," as used in the declaration, means the point at which the condominium can no longer add additional phases. We are unpersuaded.

The defendants rely on the parties' stipulation that "[t]he right to expand the [c]ondominium expired on July 19, 1990; accordingly, no more land or units may be added and the . . . [c]ondominium is fully expanded." The phrase "fully expanded," as used in the declaration, however, means something entirely different from the phrase "fully expanded," as used in the stipulation. The stipulation does not refer to the declaration's definition; instead, it simply uses the phrase to mean that the condominium can no longer be expanded. The stipulation, therefore, does not alter the reasoning or outcome of this case, which depends entirely on the unambiguous language of the declaration.

The defendants respond that ambiguity exists because, despite the parties' stipulation that the association is "fully expanded," they now dispute the meaning of that phrase. We disagree. "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 273 Conn. 735. The simple fact that the parties have different understandings of the declaration does not compel uncertainty. Moreover, even if the declaration is ambiguous, which it is not, the trial court is only bound to

consider relevant extrinsic evidence. *Il Giardino, LLC v. Belle Haven Land Co.*, 254 Conn. 502, 511, 757 A.2d 1103 (2000). Here, the parties' stipulation is dated August 20, 2008, more than twenty-five years after the original declaration was filed in July, 1983. The stipulation would be too far removed in time from the original declaration to be considered relevant extrinsic evidence.

The defendants next argue that the declaration is ambiguous because, while article IIIa describes phases II, III, IV and V only as the " 'remaining land,' " other articles within the declaration and the public offering statement describe those phases as the " 'remaining land,' " " 'expansion parcels' " and " 'additional land.' " We disagree. These descriptive phrases are indistinguishable and clearly refer to the same land. General Statutes § 47-70 (b) (4) defines " 'additional land' " as "all land that may be added to the condominium . . . ." When the declaration was recorded, the condominium potentially could have added phases II, III, IV and V. Article V of the declaration provides that the easements are "in favor of the additional land"; article III of the declaration provides that the easements are "in favor of the expansion parcels *as set forth in [a]rticle IIIa* hereof"; and the public offering statement describes the units as subject to easements "in favor of the additional land *as set forth in [a]rticle IIIa of the [d]eclaration*."[9]

[9] The defendants also claim that the declarant failed to fully and accurately disclose the easements, as required by General Statutes § 47-71b, which provides in relevant part: "A public offering statement . . . shall disclose fully and accurately the characteristics of the condominium and shall make known to prospective purchasers . . . (5) the significant terms of any . . . easements . . . ." Because the public offering statement describes the units as subject to easements in favor of the additional land as set forth in article IIIa of the declaration, and because the declaration unambiguously describes easements that terminate only if the condominium adds the additional land, we conclude that the declarant properly reserved and disclosed the easements.

The defendants further claim that the declaration's easement reservation failed to comply with the requirements of the act. They cite § 47-70 (b)

(Emphasis added.) The declaration and the public offering statement consistently describe the same parcels of land and do not provide any different expiration dates for the easements; the phrases are interchangeable and do not lead to ambiguity.

The defendants also contend that the declaration is ambiguous because it grants easement rights over certain common elements, such as the roadway, Harbour Close, even though article VIII, § 2 (a) of the condominium's bylaws limits the "[u]se of the [c]ommon [e]lements . . . to the [u]nit [o]wners, their tenants and a reasonable number of their guests." We discern no ambiguity in these facts. The parties stipulated that "certain driveways and a private roadway known as Harbour Close . . . are common elements . . . ." Article VII of the declaration defines "[c]ommon [e]lements" as "all portions of the [c]ondominium except the [u]nits" and § 47-68a (e) defines "[c]ommon elements" as "all portions of the condominium other than the units." While the declaration granted Harbour Pointe easement rights over these stipulated common elements—the driveways and the roadway—the use of the rest of the common elements, meaning the rest of the condominium besides the units themselves, is restricted to unit owners, their tenants and a reasonable number of their guests. The statement in the bylaws clearly pertains to the rest of the common elements and not to the driveways and the roadway. Moreover,

(3), which provides in relevant part that an expandable condominium's declaration must contain: "A time limit, not exceeding seven years from the recording of the declaration, upon which the option to expand the condominium shall expire, together with a statement of the circumstances, if any, which will terminate that option prior to the expiration of the time limit so specified . . . ." The declaration, however, specified the circumstances in which the expansion option would terminate prior to the seven year expiration date—when "the remaining land is added to . . . [the] [c]ondominium." We conclude, therefore, that the trial court properly determined that the easement reservation complied with the requirements of the act.

a landowner can restrict use of his or her property to certain individuals and still grant an easement; one action does not preclude the other. The statement in the bylaws, therefore, is not at variance with easements and does not lead to ambiguity.

We hold that the trial court properly concluded that the declaration clearly and unambiguously grants easements that terminate only if the condominium adds the remaining phases. Accordingly, we conclude that the trial court properly issued an injunction permanently enjoining the defendants from interfering with Harbour Pointe's use and enjoyment of the easements and issued an order quieting title to the easements in Harbour Pointe.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER and EVELEIGH, Js., concurred.

VERTEFEUILLE, J., dissenting. I respectfully disagree with the majority's conclusion that the condominium declaration (declaration) in the present case clearly and unambiguously gives the plaintiff, Harbour Pointe, LLC, a developer and the current owner of certain real property in New Haven identified as phases III, IV and V of Harbour Landing, an expandable condominium (Harbour Landing), which property was never added to the condominium, a permanent easement over that property at the expense of Harbour Landing. Notwithstanding a few inartfully drafted sentences in the declaration on which the majority rests its interpretation, I believe that an analysis of the full declaration, under which the named defendant, Harbour Landing Condominium Association, Inc. (association),[1] was created, considered in light of the history and purpose of the

---

[1] The association's president, David Potter, also was named as a defendant. References herein to the association and Potter jointly are to the defendants.

Condominium Act of 1976 (act), General Statutes § 47-68a et seq., and the other condominium documents, makes clear that the disputed easements ended with the expiration of the expansion rights of Harbour Landing Development Corporation (declarant), the plaintiff's predecessor in interest. See footnote 3 of the majority opinion. Accordingly, I respectfully dissent.

As an initial matter, I agree with the majority that the resolution of this appeal hinges on the proper interpretation of the easement provisions of the declaration. I disagree, however, with the majority's assumption that a condominium declaration, like other types of contracts, is to be interpreted in the first instance solely based on the intent of the drafting parties, as expressed in the language of the declaration itself. There are two fundamental distinctions between condominium declarations and more conventional forms of contracts that counsel against such an approach.

First, although a condominium declaration does establish the rights and obligations of multiple parties, there is in fact only one party to the declaration itself: the declarant. The other parties whose rights will be determined by the declaration, most notably the unit purchasers who will then belong to the condominium association, play no role in its drafting. In disputes, then, between unit owners and the declarant,[2] adopting a rule of construction that gives primacy to the intent of the drafter will significantly benefit a declarant at the expense of the unit owners, since the former may be presumed to have drafted the declaration to protect its own legal interests. As I discuss hereafter, eliminating the ability of condominium developers to stack the deck in their own favor at the expense of unsuspecting

[2] Throughout this opinion, references to conflicts between unit owners and the declarant should be understood to include conflicts with developers, such as the plaintiff in the present case, who succeed in interest to the original declarant.

purchasers was precisely the legislature's goal in adopting the act. Accordingly, we ought to construe the declaration in the present case with this purpose in mind.

The second distinction is that a condominium declaration is not solely a child of contract law. Rather, it is a hybrid creation of contract and property law, made possible only where expressly authorized by an enabling statute. See *William Beazley Co.* v. *Business Park Associates, Inc.*, 34 Conn. App. 801, 803–804, 643 A.2d 1298 (1994); annot., 39 A.L.R.4th 98, 99 (1985). In the present case, the very first sentence of article I of the declaration makes clear that the declarant submitted the property "to the terms and conditions of the [act] . . . ." The declarant reiterates this point twice in article III of the declaration, where the key phrase "expandable condominium" is defined by reference to the act. Likewise, no fewer than six references to the act appear throughout article II, the "definitions" section of the declaration. Given this intimate relationship between a condominium declaration and the enabling statute that governs it, courts seeking to parse disputed declaration provisions have properly *begun* the interpretive process by reading the language of the declaration in light of the enabling statute and the accompanying bylaws. See, e.g., *Johnson* v. *Fairfax Village Condominium IV Unit Owners Assn.*, 548 A.2d 87, 91 (D.C. 1988) (noting that while "rules of contract interpretation are generally applicable to the interpretation of bylaws . . . [a] condominium declaration, bylaws, sales agreements, and the relevant statutes must be construed as a whole . . . [because] laws in existence at the time a contract is entered into are implicitly incorporated into the agreement" [citation omitted]); *Wilderness Country Club Partnership, Ltd.* v. *Groves*, 458 So. 2d 769, 771 (Fla. App. 1984) (concluding that declarations explicitly submitted subject to state condominium statute "evidence an intent . . . to

be bound by the condominium act as it existed when the declaration was recorded"); *Wolinsky* v. *Kadison*, 114 Ill. App. 3d 527, 532, 449 N.E.2d 151 (1983) ("When a controversy arises as to the rights of a unit owner in a condominium, we must examine any relevant provisions in the condominium enabling statute, consider the declaration, and study the bylaws and attempt to reconcile the three . . . . We must construe the declaration, bylaws and statute as a whole." [Citation omitted.]); *Dulaney Towers Maintenance Corp.* v. *O'Brey*, 46 Md. App. 464, 465–66, 418 A.2d 1233 (1980) (same).

This case law is not in direct conflict with the language in *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 873 A.2d 898 (2005), on which the majority relies. That case, like *Johnson*, notes the general applicability of principles of contractual interpretation to condominium declarations. *Cantonbury Heights Condominium Assn., Inc.*, also acknowledges, however, that in parsing the language of the declaration, we must take "into consideration the circumstances of the parties and the transaction." Id., 735. In the present case, the intent of the declarant and the circumstances of the declaration clearly were informed by the governing framework established by the act. I thus agree with the trial court, which properly found that "[w]hile the dispute in this case is determined by the language of the declaration, the enabling legislation provides part of the context within which the declaration must be interpreted." Indeed, the court in *Cantonbury Heights Condominium Assn., Inc.*, looked to the enabling statute to assist in the interpretation of the declarant's language and intent, observing that "the declaration . . . must adhere to the requirements of the act . . . ." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 740.

Accordingly, before analyzing the declaration itself, I briefly consider the relevant provisions of the act pursuant to which the declaration was submitted to determine how the act treated the reservations of easements in expandable condominiums. This presents "a question of statutory interpretation, over which we exercise plenary review." *Ziotas* v. *Reardon Law Firm, P.C.*, 296 Conn. 579, 587, 997 A.2d 453 (2010). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Aqleh* v. *Cadlerock Joint Venture II, L.P.*, 299 Conn. 84, 91, 10 A.3d 498 (2010). Because I conclude that the relevant provisions of the act are not plain and unambiguous, my analysis is not constrained by the plain meaning rule. Rather, I look for interpretive guidance to "the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005). Two provisions of the act are relevant for present purposes.

First, the act defines an " '[e]xpandable condominium' " such as Harbour Landing, as one "to which additional land may be added in accordance with the provisions of the declaration and of this chapter." General Statutes § 47-68a (y). " '[A]dditional land,' " in turn, is defined simply as "all land that may be added to the condominium . . . ."[3] General Statutes § 47-70 (b) (4). The majority concludes that this definition is not ambiguous, that in a particular expandable condominium the "additional land" is—and always will be—any land that

---

[3] The act does not use the terms "remaining land" or "expansion parcels," but I assume, arguendo, that the majority is correct in concluding that in the declaration these terms are used synonymously with "additional land."

could potentially have been added at the time the declaration was recorded. I disagree.

It is true that the statutory definition may be read consistent with the majority's view, that "additional land" is defined at the time of declaration. On that view, a condominium that was expandable at the outset remains "expandable," even if the declarant does not in fact expand it before the expansion deadline has passed. But the act may also be read in a temporally indefinite manner, so that once the window for expansion has closed, and no land may be added to a condominium, the original expansion parcels cease to be "additional land" and the condominium ceases to be "expandable." This is, arguably, the most literal reading of the text of § 47-70. It is certainly a reasonable one. Because there is more than one reasonable interpretation of the statute, I find it to be ambiguous.[4] The majority provides no rationale for assuming that the legislature intended that the key terms "additional land" and "expandable" be defined at the time of the recording of the declaration rather than when a subsequent dispute arises. I believe that that ambiguity, which reflects a fundamental policy choice, should be resolved by reference to the history of § 47-70.

A second source of ambiguity in the governing statute relates to the types of easements that a declarant is permitted to reserve in the declaration. Section 47-70

---

[4] Alternately, the ambiguity of the statute might be said to arise not from its temporal indefiniteness but, rather, from the distinct logical forms under which it might properly be characterized. That is, the statement identifying as " 'additional land' " "all land that may be added to the condominium"; General Statutes § 47-70 (b) (4); might be represented either as: (1) identifying a particular plot of land—an expansion phase; or (2) defining the set of land identified by a particular characteristic—that it may be added to a condominium. The latter may be, or may become, an empty set, whereas the former may not.

(d),[5] which was adopted together with the expandable condominium provisions as part of the act, expressly requires that units be conveyed to purchasers in fee simple absolute. Of the permissible exceptions to this requirement, only those in subdivision (1) of § 47-70 (d) might plausibly permit the easements created in the present case. That provision limits the easements that may encumber a condominium to "[p]roperty reservation which land developers commonly convey or dedicate to local bodies, public or private utilities or other easements, for the purpose of bringing utilities to or through the condominium, access to or through the condominium, and drainage to, from, and through other land in the vicinity of the condominium, and drainage to, from and through other land in the vicinity of the condominium . . . ." General Statutes § 47-70 (d) (1).

There are several sources of ambiguity in the statutory language. First, the first half of the subdivision, beginning with the word "[p]roperty" and ending with

[5] General Statutes § 47-70 (d) provides: "The property submitted to a condominium declaration pursuant to this chapter, other than a nonresidential condominium, shall be conveyed by the declarant to purchasers in fee simple absolute, subject *only* to covenants, easements and liens, *limited* as follows:

"(1) Property reservation which land developers commonly convey or dedicate to local bodies, public or private utilities or other easements, for the purpose of bringing utilities to or through the condominium, access to or through the condominium, and drainage to, from, and through other land in the vicinity of the condominium, and drainage to, from and through other land in the vicinity of the condominium;

"(2) Taxes and assessments imposed by any public body having authority to assess and tax property, or by a property owners' association, which under law constitute liens before they are due and payable;

"(3) Mutually beneficial property restrictions which would be enforceable by other owners in the subdivision or project of which the condominium is a part for more than five years after the first declaration in a planned project. Such restrictions shall not give declarant or any other person more power per unit owned than that which is proportionately equal to his fraction of the number of similar units planned or constructed in such subdivision or project, and the property shall not be subject to leasehold or reversionary interest." (Emphasis added.)

"other easements," is subject to three different interpretations, each of which is arguably either ungrammatical or nonsensical. General Statutes § 47-70 (d) (1). It might identify three different types of easements: (1) a property reservation to local bodies; (2) public or private utilities; and (3) other easements. But utilities are not easements. Alternately, it might identify two types of easements: (1) a property reservation to local bodies or utilities; and (2) other easements. That construction is ungrammatical as written, however, wanting a coordination conjunction between the words "bodies" and "public." Finally, the sentence might identify three types of common property reservations—those to local bodies, those to utilities, and other types. That reading, however, would result in the awkward construction: "Property reservation which land developers commonly convey or dedicate to . . . other easements . . . ." Because any of these readings is plausible, and none can be reconciled fully with the language used,[6] the text is ambiguous.

This ambiguity is important. If the qualifying phrase "which land developers commonly convey" in § 47-70 (d) (1) does apply to the "other easements" that presumably would include those in the present case, then the legality of those easements would hinge in part on whether such easements were common at the time. The trial court made no such finding.[7]

Second, regardless of how the first half of subdivision (1) of § 47-70 (d) is construed, it is unclear whether the

---

[6] Indeed, the fact that the final portion of § 47-70 (d) (1) discussing drainage "to, from and through" is repeated twice, verbatim, suggests that this draft of the statute may have wanted some additional refining.

[7] It also is unclear whether the second half of the sentence, beginning with the phrase "for the purpose of bringing," modifies only "other easements" or also "local bodies, public or private utilities . . . ." General statutes § 47-70 (d) (1). That third source of ambiguity is not relevant for present purposes, however, because in either case the phrase does modify the "other easements" language relevant to the Harbour Pointe development.

second half permits the sort of utility easements at issue here. The statute permits utility easements only "for the purpose of bringing utilities *to or through* the condominium . . . ." (Emphasis added.) General Statautes § 47-70 (d) (1). The text makes no explicit allowance for easements, such as the ones in the present case, that bring utilities *from* a condominium for the benefit of other adjacent but independent properties. Of course, the term "through" in the statute might be construed broadly, to include the bringing of utilities from a condominium, to other, unaffiliated properties, long after construction of the condominium has been completed. The fact that the very next line in the statute, however, contains the phrase "drainage to, *from*, and through other land"; (emphasis added) General Statutes § 47-70 (d) (1); suggests that the drafters may have made a conscious choice not to permit declarants to reserve utility easements burdening the subject condominium. At very least, the drafters' intent is ambiguous.

To resolve these ambiguities, I look both to the broader structure of the act and to its legislative history, considered in light of the development of condominium law in the United States over the past fifty years. The condominium represents a relatively recent creation of property law, with most states having passed condominium acts only after the adoption of the federal Housing Act in 1961. L. Joliet, "The Expandable Condominium: A Technical Analysis," 9 A.B.A. L. Notes 19 (1972). By the early 1970s, there was broad agreement that first generation condominium acts suffered from two fundamental flaws: they "unreasonably restrict[ed] the inherent flexibility of the condominium concept, while failing to provide an adequate measure of purchaser protection in this new field of real estate law." Report of the Committee to Study and Recommend Revision of the Condominium Laws to the Governor and the General Assembly of Virginia, Va. House Doc. No. 5, p. 3 (1973)

(Virginia Report); see also J. Inglis, note, "Expanding Condominiums in Ohio," 29 Case W. Res. L. Rev. 228, 231, 257 (1978) (early drafts of condominium statutory scheme in Ohio restricted flexibility of developers that could cause financial loss and inconveniences to both builders and purchasers, while subsequent amendments retained flexibility on developer's part with consumer protection against uncertainties provided through disclosure).

The inflexibility of first generation condominium acts reflected in part the fact that title typically could not be transferred from developers to unit owners until all of the units in a development were completed. See, e.g., L. Joliet, supra, 9 A.B.A. L. Notes 19. This created a dilemma for developers. There are significant "economies of scale" associated with larger condominium projects. See Virginia Report, supra, p. 7. For example, larger developments allow owners to spread fixed costs such as professional management, recreational facilities and the like over a greater number of units. Under the old rules, however, planning and completing a large condominium complex created significant challenges for both developers and buyers. The developer might underestimate the number of interested buyers, thus losing potential sales. See id. Worse yet, it might overestimate demand, threatening the entire project. In either event, the developer had to carry construction financing costs on completed units until an entire development was finished. L. Joliet, supra, 19. At the same time, would-be buyers might be deterred by their inability to obtain timely title to their condominium units and control over the condominium association from the developer. Id.

Critics of first generation condominium statutes also decried a range of abusive practices by which unscrupulous developers were able to take advantage of consumers. Examples included developers maintaining

indefinite control over condominiums by retaining ownership of the last unit, binding the condominium to self-dealing "sweetheart" agreements benefiting them at the expense of future owners, and saddling buyers with higher than expected maintenance costs. See Virginia Report, supra, p. 3.

In response to these concerns, in the early 1970s, the Virginia legislature directed that a committee be appointed to study the problems with the existing condominium statutes and to propose a second generation condominium act that would provide greater flexibility for developers while increasing consumer protection (committee). See id., p. 2. Noting that none of its sister states had yet attempted to resolve these problems; id., p. 3; the committee took as its mandate the creation of "a model and a pattern for new condominium legislation throughout the United States." Id., p. 4. Indeed, the Virginia statute adopted in 1974 based on the committee's recommendation (model statute); Virginia Condominium Act, Va. Code Ann. §§ 55-79.39 through 55-79.103 (Sup. 1974); became a model for second generation condominium statutes throughout the country, including the act in Connecticut. See note, "Nineteenth Annual Survey of Developments in Virginia Law 1973–1974, Property," 60 Va. L. Rev. 1583, 1591 and n.64 (1974); see also W. Hyatt, Condominium and Homeowner Association Practice: Community Association Law (3d Ed. 2000) § 1.05 (b), p.12.

The committee sought to provide developers greater flexibility by permitting a variety of "progressive" development options, including convertible, contractable and expandable condominiums. Virginia Report, supra, pp. 5–7. All of these options are designed to allow developers to take advantage of strong consumer demand for a project should that demand materialize, while at the same time not locking developers into overly ambitious projects if demand proves weaker than

expected. Id. In the case of the expandable condominium in particular, the committee emphasized that this development model was designed for the scenario where a developer "hopes ultimately to develop" an entire plot of land into a single complex, but wants to reserve the right to keep the project smaller if demand is not as high as had been expected. Id., p. 7.

I take from this history that the intent of the expandable condominium provisions of the committee's model statute was to afford both developers and buyers the security of being able to complete a large project piece by piece, insulated from the risk that a worse than expected market might leave both buyers and sellers facing the problems associated with a project abandoned midstream. The intent does *not* appear to have been to allow a developer to entice early phase buyers with the promise of a large development, where road and utility costs would be shared with future buyers, only to have the developer turn around and create an independent development on the adjacent expansion parcels. The intent certainly was not to achieve the outcome advocated by the plaintiff, in which early phase buyers not only lose their anticipated economies of scale, but actually are forced to shoulder the fixed costs of a wholly unrelated neighboring development.

The consumer protection provisions of the model statute further bolster my view that the majority's interpretation of the declaration runs contrary to the rationales underlying modern condominium law. In the synopsis to the model act, the committee underscored that the primary focus of the reformed legislation is to create "a higher degree of consumer protection . . . ." Id., p. 3. The Virginia Report specifically notes the importance of allowing unit owners to obtain full, ongoing control of their development, including the freedom to "rescind or renew at will any contracts or leases

entered into on their behalf during the period of developer control." Id.

The Connecticut legislature, in drafting the act in 1976, drew heavily on the committee's report and model statute. See Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1976 Sess., pp. 147, 162–63. Indeed, many provisions of the act are drawn more or less verbatim from the model statute. For example, § 47-68a (y), defining expandable condominiums, and § 47-70 (b) (1) through (10), setting forth many of the declaration requirements for expandable condominiums, are virtually identical, respectively, to §§ 3 (n) and 16 (c) (1) through (10) of the model statute. Moreover, the legislative history of the act makes clear that our legislature, in borrowing liberally from the model statute, was guided by the same concerns as the Virginia committee: protecting the interests of buyers against self-dealing by developers, while facilitating the construction of multiphase condominium developments. The "Statement of Purpose" of Raised House Bill No. 5014 (1976), which became the act, lays out the simple goal of the law: "To provide necessary protection to prospective purchasers and to owners of condominium units in this state." Raised Committee Bill No. 5014 (1976). Representative Ernest Abate, speaking in support of House Bill No. 5014, made clear that the predecessor statute "offered the opportunity for abuse" and that the bill was written in "an effort to remedy . . . and to prevent potential future abuses . . . ." 19 H.R. Proc., Pt. 7, 1976 Sess., p. 2684; see also id., p. 2675, remarks of Representative Albert Webber (as sponsor of bill in House of Representatives, Representative Webber referred to bill as "a much needed and long overdue condominium protection bill" designed to allay "all kinds of bitter complaints about condominiums" and to protect buyers' investments).

The following week, the bill's Senate sponsor, Senator Louis Ciccarello, in explaining the unanimous House vote in favor of Bill No. 5014, elaborated: "[I]f condominium sales have multiplied, so have reports of misrepresentations, self-dealing contracts and other abuses by condominium developers. Consumer problems in the condominium industry have received much attention in recent months. There is low-balling, the practice of understating the monthly condominium fee charged for maintenance of common areas and other building expenses  . . . .  There is the sweetheart contract  . . . .  There is a ninety-nine year recreation lease in which the owners find that they do not own the swimming pool or other facilities but in fact are leasing them from the developer at a steep rental fee. . . . The owners find that after they take control that they are saddled with expensive repairs  . . . .  Caveat emptor is the only applicable doctrine. . . . [T]his all points out the need to revise our condominium laws in the [s]tate of Connecticut. . . . [T]his bill will serve to eliminate the abuses and complaints which have affected condominium sales and it will have the effect of raising consumer confidence  . . . ." 19 S. Proc., Pt. 6, 1976 Sess., pp. 2474–77.

Consistent with those goals, the act contains a number of provisions designed to prevent condominium developers from using self-dealing declarations to lock unsuspecting buyers into costly long-term agreements. Examples include General Statutes § 47-74b,[8] which

[8] General Statutes § 47-74b (a) provides in relevant part: "Except for covenants, liens and easements permitted by subsection (d) of section 47-70, any grant or reservation made by or pursuant to the condominium instruments, and any contract made by the declarant or by an association prior to assumption of control of the association by unit owners other than the declarant that provides for management, maintenance or operation of the condominium, or of any common elements serving the unit owners or available to them, shall expire not more than five years from the date of the recording of the original declaration, unless extended by vote of a majority of the unit owners other than the declarant. Any such grant, reservation or contract may be cancelled prior to its stated expiration date, or amended,

requires the termination after five years of any contract made by the declarant on behalf of the development if the contract is not extended by the unit owners; and General Statutes § 47-74c,[9] which bars the declarant from requiring lease payments for, or conveying to non-residents, the condominium's recreational facilities.

I think it is especially noteworthy that where the act departs from the model statute, it does so in favor of *greater* protection for unit purchasers. For example, subdivisions (12) and (13) of § 47-70 (b),[10] which do not appear in the model statute, establish a robust notice requirement for expandable condominiums. The phrase " 'an expandable condominium' " must appear in the name of every expandable condominium. More importantly, declarants must warn prospective purchasers, in conspicuous lettering, on the very first page of the condominium declaration as well as just above the signature line on all purchase agreements, of any powers or rights reserved to the declarant. General Statutes

notwithstanding any provision to the contrary therein, by the unit owners' association by vote of a majority of the unit owners other than the declarant. . . ."

[9] General Statutes § 47-74c (a) provides in relevant part: "The declarant shall not retain ownership of, and lease or otherwise require payment for the use of the recreation facilities nor shall the declarant convey such recreation facilities to any person other than to the unit owners of the condominium served by such recreation facilities, which shall be common elements of the condominium within which they are located or which they serve . . . ."

[10] General Statutes § 47-70 (b) provides in relevant part: "(12) The name of the condominium shall include 'an expandable condominium';

"(13) If under this subsection (b) a statement that there are no limitations, no termination of rights, no assurances given, or no maximum amount of land is designated, there shall also appear on the first page of the condominium declaration following the title, but prior to any text the words in letters which are conspicuously larger than used in the text: 'Warning this is an expandable condominium in which there is no assurance or limitation on (hereafter specify the reserved power).' The same words shall conspicuously appear on purchase agreements for units subject to this declaration immediately above the purchaser's signature."

§ 47-70 (b) (13). In other words, the act embodies the legislative expectation that the declarant's control over a condominium project will be circumscribed and short-lived, and that prospective buyers will be clearly informed of the extent of such control.

Three lessons emerge from this review of the language and history of the act. First, there is no indication that the drafters of either the model statute or the act considered the possibility that a developer might decline to add expansion phases to a condominium, but nevertheless seek to burden the owners of condominium units with the costs associated with a permanent easement in favor of an unrelated development on those expansion parcels. Quite the contrary, the assumption appears to have been that where expansion did not occur, the links between the initial and expansion phases would be severed.

Nor do I think it likely that any of the initial Harbour Landing unit purchasers considered this possibility. The initial declaration was recorded in January of 1983, less than seven years after the passage of the act. Because the act created a default seven year window for the completion of expandable condominiums, it is doubtful that the expansion rights of many, if any, condominiums created pursuant to the act had terminated by that date. I am not aware of any cases in Connecticut or other jurisdictions that ever have addressed the issue. Accordingly, in parsing the condominium documents in the present case, there is no reason to assume that the parties foresaw and spoke to the issue at bar.

The second lesson to be drawn from the statutory history is that the act, as with the Virginia Report on which the act was modeled, was remedial in nature. It specifically sought to thwart the pervasive use of self-dealing declarations, by which developers benefited themselves, or their independent development projects,

at the expense of condominium unit buyers. We have made clear that remedial statutes "must be afforded a liberal construction in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 237 Conn. 123, 133, 676 A.2d 369 (1996). Accordingly, when, as here, a condominium developer arguably concocts a novel method of saddling the condominium buyers with the unfairness of an unrelated condominium with unexpected and arguably unreasonable costs, courts should construe provisions of the condominium declaration with due regard for the consumer protections embodied in the act.

The third lesson I draw from the broader structure and history of the act is that the balance between protecting consumers and affording greater flexibility to developers turns on the fulcrum of adequate notice. Where the act gives a declarant options, it imposes on it a corresponding duty to inform potential buyers clearly and explicitly that they purchase subject to the decisions that a developer has made with regard to those options.

In interpreting the declaration in the present case, I also rely heavily on the principle that the burden of ambiguity should fall on the party best positioned to avoid the cost thereof. Accord F. Kieff, "The Case for Registering Patents and the Law and Economics of Present Patent-Obtaining Rules," 45 B.C. L. Rev. 55, 99 (2003) (noting that United States Court of Appeals for Federal Circuit has imposed clear notice requirement of what will infringe patents because patentee, as drafter, is least cost avoider of such ambiguities).[11] Under the act,

---

[11] The majority acknowledges this principle, quoting *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 273 Conn. 735, for the rule that where contractual "language is ambiguous . . . [we] must construe those ambiguities against the drafter." Nevertheless, in footnote 6 of its opinion, the majority appears to suggest that any ambiguities in the declaration need not be construed against the plaintiff. The majority offers two rationales for this position, neither of which I find persuasive.

a declarant already is required to make numerous clear, unambiguous disclosures to potential buyers; it can easily reserve an easement such as that sought by the plaintiff in the present case by simply inserting one additional disclosure: a first page statement that would

First, the majority suggests that the plaintiff, rather than the association, was the grantee of the easements, and thus is entitled to the benefit of any ambiguities. I disagree. Here, the declarant was, in essence, both the grantor and the grantee of the easements; it reserved for its own benefit an easement over phase I, which it owned but intended to sell to other parties, in favor of the other phases, which it owned and did not immediately intend to sell. See 15A Am. Jur. 2d, Condominiums § 1 (2000) ("[a condominium declarant] is a grantor that establishes or joins in the creation of a declaration of condominium"); *Rock Lake Estates Unit Owners Assn., Inc.* v. *Lake Mills*, 195 Wis. 2d 348, 373, 536 N.W.2d 415 (App. 1995) (noting that declarant who reserved easement over condominium in favor of her adjacent parcel "is not the grantee of the adjacent property she claims is landlocked; she is the gran*tor*" [emphasis in original]). The defendants' citation in their brief to *Gager* v. *Carlson*, 146 Conn. 288, 298, 150 A.2d 302 (1959), for the rule that "in the construction of an instrument creating an easement, ambiguous language, in a case of reasonable doubt, will be construed in favor of the grantee *rather than in favor of the grantor*," is, thus, inapposite. (Emphasis added.) Rather, this situation is governed by the rule that a "declaration of condominium and its amendments should be strictly construed to assure investors that what a buyer sees the buyer gets. . . . Any ambiguity in a declaration of condominium must be construed against the developer who authored the declaration." 15A Am. Jur. 2d, supra, § 8.

Second, even if we were to assume that any ambiguities in the declaration are to be resolved against the declarant, the majority questions whether the plaintiff is a successor in interest to the declarant. It clearly is. The plaintiff acquired the phase III through phase V property from a successor to the Harbour Landing declarant. The plaintiff thus stands in the shoes of the original declarant. See *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC,* supra, 273 Conn. 728–29, 735 (construing ambiguities in declaration against developer who acquired special declarant rights by quitclaim deed after bank acquired them from financially troubled declarant). The declaration must thus be construed against the plaintiff. Id.; see also *Portfolio Financial Servicing Co.* v. *Gill Industries-Georgia,* United States District Court, Docket No. 2:06-CV-60 TS, 2006 WL 1699610, *3 (D. Utah June 15, 2006) (construing ambiguities in security agreement against successor in interest to drafter); *Life of America Ins. Co.* v. *Baker-Lowe-Fox Ins. Marketing, Inc.*, 316 Ark. 630, 636, 873 S.W.2d 537 (1994) (" 'giving the [p]laintiff herein the benefit of the doubt, [the marketing agreement] is still ambiguous and must be construed against the drafter . . . and its successor in interest, the [p]laintiff herein' "). To hold otherwise would allow declarants to circumvent the statutory and common-law protections of condominium purchasers.

provide language such as "if the expansion phases are not added to the condominium within seven years from the date of recording of the declaration, those phases nevertheless will retain an easement in perpetuity over the condominium property, as described in [the particular article of the condominium declaration]."[12] By contrast, where the scope and nature of reserved easements are unclear, they should not be interpreted to impose an endless and costly burden on the unit owners of the condominium. The declarant, as the drafter, and its successors should thus bear the burden of any latent ambiguities as to the scope of the easements reserved in the condominium declaration.

I turn, then, to the declaration for Harbour Landing to determine the scope of the easements established in the declaration. Rather than clearly and precisely defining the nature of the reserved easements for ingress and egress and to connect to utilities, the declarant, the plaintiff's predecessor, described the easements using confusing and imprecise language. First, the phrase "until and unless" used to limit the duration of the easements described in both articles IIIa and V of the declaration is unnecessarily confusing. Black's Law Dictionary (4th Ed. 1968) defines "unless" in pertinent part as "a conditional promise." By contrast, it defines "until" in pertinent part as "[a] word of limitation, used ordinarily to restrict that which precedes to what immediately follows it, and its office is to fix some point of time or some event upon the arrival or occurrence of which what precedes will cease to exist." Id. These words thus have very different meanings, with the result that the meaning of the provision that the easements in question continue "unless and until" the additional land is added is unclear at best.

---

[12] Of course, this assumes that such easements are legal under § 47-70 (d), a question I do not address.

A second phrase whose meaning is elusive is the term "fully expanded," which triggers the termination of the easements in article V of the declaration. The defendants contend that once the seven year window for expansion had closed, the condominium was fully expanded because no further expansion was possible. The plaintiff responds that only a "tortured" reading of the language of the declaration supports the defendants' interpretation. I agree with the defendants.

The question here, in essence, is whether something that might have grown to reach a certain size, but whose growth is irrevocably halted before reaching that size, can reasonably be said to be "fully" grown. I conclude that it can because to prevail, the defendants need establish only that their interpretation of the declaration is one reasonable reading of the document. To my mind, the fact that we do use similar expressions in the way the defendants contend renders their reading reasonable.

The joint stipulation of facts signed by the parties in the trial court further supports my understanding of the term "fully expanded." The defendants make much of the fact that the plaintiff stipulated to their interpretation of the term, whereas the majority contends that the stipulation, to which the parties agreed more than twenty-five years after the recording of the original declaration, does not speak to the original intention of the parties. Both the defendants and the majority miss the point here. The stipulation does not commit the plaintiff to an interpretation of the declaration with which it clearly does not agree. But the fact that the plaintiff itself readily agreed that Harbour Landing is fully expanded, and that the term "fully expanded" can be applied to a situation where an expandable condominium is never completed, does provide strong support for my belief that it is reasonable to read the

easement language in the declaration consistent with the defendants' view.[13]

Nor does the declaration ever define the key term "additional land" to which the easements in article V attached. The same ambiguity that plagues the act thus infects the declaration as well: it is unclear whether land that might once have been added remains "additional land" once the window for adding such land to the original development has closed.

In short, the declaration fails to establish clearly that the condominium property is subject to perpetual and costly easements for the benefit of an adjacent unrelated development. The declarant had numerous opportunities to state clearly and unambiguously that it intended to retain a permanent easement should the expansion parcels not become part of Harbour Landing. The declarant could have included such a statement on the first page of the declaration, where other important consumer disclosures appeared prominently. It could have defined key terms such as "additional land" and "fully expanded" in the definitions section of the declaration, where it defined twenty other terms. It could have stated explicitly that after seven years it would hold the easements "in perpetuity."[14] It could have clari-

[13] The majority contends that article V of the declaration "defines" the phrase "fully expanded" as meaning the addition of the maximum number of units permitted by the declaration, or 300 units on a 9.4174 acre site. I disagree. The declaration *defines* terms in article II, from which the term "fully expanded" is conspicuously absent. Article V merely provides that the *maximum* number of units permitted in the fully expanded development is 300. The sentence to which the majority points falls within a section of the declaration laying out the parameters of various features of the condominium. The clear intent of the sentence referred to by the majority is to inform buyers of the maximal potential size of the development. It never purports to serve as a definition.

[14] The declarant clearly knew how to create a perpetual easement when it chose to. Article IIIa of the declaration, the same article that establishes the presently disputed easements, begins by stating: "Declarant does hereby establish, create, dedicate and convey an *easement in perpetuity* in favor of the public to pass and repass on foot . . . ." (Emphasis added.)

fied the scope and duration of the easement when it amended the declaration in 1986, 1988 and again in 2001. Most importantly, the declarant could have made clear the permanent nature of the easements in the public offering statements supplied to potential buyers. Indeed, the declarant was required to do so under General Statutes § 47-71b,[15] but nevertheless failed to do so.

The plaintiff contends, and the majority agrees, that notwithstanding any ambiguity in the description of the easement in article V of the declaration, article IIIa does in fact clearly and unambiguously establish an easement in perpetuity despite the declarant's decision not to add the expansion parcels. For the following four reasons, I disagree. First, I reiterate that the use of the expression "until and unless" in article IIIa can be read to indicate that the contingency terminating the easements was expected to occur. Even the article IIIa description of the easements is thus not unambiguous.

Second, even if the language in article IIIa does appear to be unambiguous, the declaration includes other, parallel language, which clearly is not intended to be interpreted as having perpetual duration. The third paragraph in article V of the declaration, for example, provides that the "[d]eclarant . . . reserves the right . . . to maintain sales and administration offices in the [c]lubhouse until all [u]nits in *all phases* of the [c]ondominium are sold by the [d]eclarant." (Emphasis added.) This reservation is restated in the third to last paragraph of the same article: "[T]he [d]eclarant has reserved a right to maintain sales and administration offices in the

---

[15] General Statutes § 47-71b provides in relevant part: "A public offering statement, issued pursuant to section 47-74f, shall *disclose fully and accurately* the characteristics of the condominium and shall make known to prospective *purchasers all unusual and material circumstances or features* affecting such condominiums. The public offering statement shall include the following . . . (5) the significant terms of any encumbrances, *easements*, liens and matters of title affecting the condominiums . . . ." (Emphasis added.)

[c]lubhouse until all [u]nits in all phases are sold by the [d]eclarant." Interpreting this provision in the same manner as the majority interprets the easements would mean that this reservation would allow the declarant to maintain a sales office in the Harbour Landing clubhouse indefinitely, until the declarant had sold every unit in its own, independent development on the adjacent expansion parcels.

That reading of the declaration, however, would conflict with General Statutes § 47-73a (e), which provides: "The declarant and his duly authorized agents, representatives, and employees may maintain sales offices and model units on the condominium parcel if and only if the condominium instruments provide for the same and specify the rights of the declarant with regard to the number, size, location and relocation thereof. Any such sales office or model unit which is not designated a unit by the condominium instruments shall become a common element as soon as the declarant ceases to be a unit owner, and the declarant shall cease to have any rights with regard thereto unless such sales office or model unit is removed forthwith from the condominium parcel in accordance with a right reserved in the condominium instruments to make such removal." Clearly, then, the reservation language does not permit the declarant perpetually to maintain sales offices in Harbour Landing buildings, from which to market its own separate development on neighboring land. Rather, consistent with § 47-73a (e), the declaration must be read to contain the reasonable restriction that the declarant can maintain offices in the Harbour Landing clubhouse only to market units that are, or will become, *part of Harbour Landing*.

Likewise, I believe that the disputed easements in the present case are most reasonably read to mean that the declarant may access the Harbour Landing roads and utilities for the purpose of developing phases that

it intends to add to Harbour Landing. After the seven year window for expansion has closed, such easements, like the sales office, are no longer necessary or appropriate. Units built on expansion parcels that are later added to the condominium no longer require such an easement, because those parcels became part of the condominium. By contrast, if the expansion parcels are not added, then just as the declarant can no longer expect to have a sales office at Harbour Landing in order to market its adjacent development, it must fend for itself when it comes to obtaining access to and utilities for those projects. A few overly general statements in the declaration—statements that conflict with the act—ought not be read to suggest the contrary.

A significant, additional reason not to construe the language of article IIIa of the declaration as the trial court has is that it conflicts with equally clear language in article VIII of the bylaws, which were recorded as an amendment to the declaration pursuant to General Statutes § 47-80 (a). "[W]hen interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." (Internal quotation marks omitted.) *Ahmadi* v. *Ahmadi*, 294 Conn. 384, 391, 985 A.2d 319 (2009). Here, § 2 (a) of article VIII of the bylaws provides: "Use of the [c]ommon [e]lements shall be limited to the [u]nit [o]wners, their tenants and a reasonable number of their guests." In adopting the plaintiff's interpretation of the easements at issue, the trial court completely failed to address this provision of the bylaws. In my view, it is inappropriate to construe an ambiguous provision of the declaration in such a manner that it is directly contradictory to a clear and unambiguous provision of the bylaws that is protective of the rights of the unit owners.

The plaintiff's interpretation of the easements also is inconsistent with provisions in the condominium documents governing access to the condominium. Article V of the declaration, for example, provides that a "gatehouse at the main [northern entrance off Sea Street] will limit access to the private road, known as Harbour Close, serving the [c]ondominium. Access at the [eastern] South Water Street juncture of the private road will be limited by a locked gate or other similar device." The fact that under article V of the declaration, both entrances to the community were secured and access to the condominium and parking spaces would be restricted to unit owners and their guests should bear on the interpretation of the easements at issue in the present case. Indeed, it is hard to imagine a rationale for simultaneously providing, on the one hand, for a secure, limited access condominium and, on the other hand, affording perpetual, unrestricted access to anyone affiliated with future independent development on adjacent land. I think the more reasonable conclusion and interpretation of the easements is that if the expansion parcels were not added to Harbour Landing, the easements intended to facilitate the expansion would expire.

Lastly, the majority fails to respond to the defendants' argument that a literal reading of the the language of article IIIa of the declaration leads to absurd results. As the defendants properly note, the plain meaning rule does not apply when following the apparent meaning of the text would "yield absurd or unworkable results . . . ." (Internal quotation marks omitted.) *Sikorsky Aircraft Corp.* v. *Commissioner of Revenue Services*, 297 Conn. 540, 547, 1 A.3d 1033 (2010). As I previously have indicated, the plaintiff's interpretation of the easements leads to absurd results when read in conjunction with the provisions in article V of the declaration, and in the bylaws, restricting the access of nonresidents

to Harbour Landing. Taken together, those provisions would mean that while the declarant took pains to preserve the privacy and security of Harbour Landing, even to the extent of limiting the residents' right to invite their *own* guests into the condominium, it simultaneously carved out an easement granting anyone associated with any independent developments it might build on the expansion parcels permanent, unlimited access to and through Harbour Landing.

The plaintiff's interpretation of the declaration also leads to absurd consequences when considered from a financial perspective. The statutory scheme governing the formation of expandable condominiums is designed to provide for an equitable distribution of the costs of maintaining the common elements of a condominium. See, e.g., Virginia Report, supra, p. 7 (emphasizing that, under model statute, when expandable condominiums were in fact expanded, common elements would be shared and common expenses jointly borne between owners of units purchased in different expansion phases). One potential problem is that if the initial phase of a condominium contains costly common elements such as a pool and clubhouse, but subsequent expansion phases do not include valuable common elements, then later phase purchasers may receive a windfall at the expense of the initial residents. The later buyers obtain an equal share of the pool and clubhouse, in this hypothetical, without having to pay a fair share of their construction. Similar problems arise when owners of one phase are saddled with expensive maintenance or service costs associated with a subsequent phase. Thus, the act requires that the declaration identify the method by which ownership of common elements will be allocated among units; General Statutes § 47-70 (a) (6); the percentage of common expenses attributable to each owner; General Statutes § 47-70 (a) (7); the precise land that may be added to an expandable condominium and

the maximum number of units allowed thereon; General Statutes § 47-70 (b) (4) through (8); and whether structures erected on the expansion parcels will be of compatible quality to those on the parcels of the initial phases. General Statutes § 47-70 (b) (10). Under the declaration, if phases III through V had been added to Harbour Landing, residents of those expansion phases would have been required to shoulder their fair share of the costs associated with, e.g., maintaining the condominium's roads and gatehouse, and connecting to the condominium's utilities. Article II, § 7, and article XXVII of the declaration specifically provide, for example, that the unit owners will be responsible for the common expenses associated with water and sewer use, payable to the South Central Connecticut Regional Water Authority and to the town of New Haven, respectively. Under the interpretation of the easements urged by the plaintiff and adopted by the trial court, however, residents of new, unrelated developments on the unexpanded phases III through V land can obtain these identical benefits without having to pay any of the associated costs. They can access the Harbour Landing gatehouse, inflict wear and tear on the condominium's roads, connect to the condominium's utility lines, draw water from the condominium's pipes, and dump their waste into the condominium's sewer lines, all at the expense of the unit owners of the initial phases.[16] I do not believe that the act, which was drafted to protect condominium purchasers from self-dealing developers, permits a declarant to lock unit owners into this disadvantageous scheme in the absence of their specific, informed consent.

For all of these reasons, I respectfully dissent.

---

[16] The plaintiff provides no support for its claim that it would be under a common-law obligation to contribute its fair share of these costs. Even if there were such an obligation, there is no evidence in the record that it has offered such payment. The defendants would thus bear the costs of litigating the issue. Moreover, it is unclear how the parties would apportion the costs associated with sewer and water use.