******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JOAN E. WELCH *v.* STONYBROOK GARDENS COOPERATIVE, INC.
## (AC 35966)

DiPentima, C. J., and Beach and Berger, Js.

*Argued February 11—officially released June 30, 2015*

(Appeal from Superior Court, judicial district of Fairfield, Hon. Richard P. Gilardi, judge trial referee.)

*Bruce L. Levin*, with whom were *George F. Martelon, Jr.*, and, on the brief, *Barbara M. Schellenberg*, for the appellant (defendant).

*Catherine L. Creager*, with whom, on the brief, was *Kevin A. Coles*, for the appellee (plaintiff).

*Opinion*

BEACH, J. The defendant, Stonybrook Gardens Cooperative, Inc., appeals from the judgment of the trial court rendered in favor of the plaintiff, Joan E. Welch. The defendant claims that the court erred in finding (1) that the defendant had breached its contract with the plaintiff, (2) in favor of the plaintiff on the ground of unconscionability, and (3) that the defendant breached the implied covenant of good faith and fair dealing.[1] We agree with the defendant on all three claims and reverse the judgment of the trial court.

The record discloses the following facts as stipulated to by the parties and as found by the trial court. The defendant owned and managed a residential cooperative complex in Stratford, comprising 200 two-story town house style duplex structures and 200 one-story ranch style duplex structures. All the town houses had wood siding. In 1965, the plaintiff, who, with her husband, was an original member of the defendant, entered into an "Occupancy Agreement"[2] with it. Article 11 of the agreement provided in relevant part: "(a) . . . The Member agrees to repair and maintain his Dwelling Unit at his own expense as follows: (1) Any repairs or maintenance necessitated by his own negligence or misuse; (2) Any redecoration of his own Dwelling Unit; and (3) Any repairs or maintenance of his range or refrigerator. (b) . . . The Corporation shall provide and pay for all necessary repairs, maintenance and replacements, except as specified in Clause (a) of this Article. . . ." Article 14 provided that members were to abide by "the Charter, Regulatory Agreement between the Corporation and the Federal Housing Commissioner, By-Laws, rules and regulations of the Corporation and any amendments thereto . . . ." The governing body of the defendant was a board of directors.

Although the 1965 occupancy agreement provided that it was subject to the rules and regulations of the defendant as thereafter amended, the defendant had not adopted any rules and regulations at that time.[3] In 1983, the defendant's board of directors enacted a regulation that affected article 11 (a) of the 1965 occupancy agreement. Under the new regulation, the defendant was to supply the paint and the members the labor when the exteriors of the units required painting. The parties never expressly amended the 1965 occupancy agreement, nor did they execute a new agreement between themselves. New forms for occupancy agreements were adopted by the defendant in 1983, 2000, 2004, and 2008, but were executed only by members who joined the defendant after the respective dates of adoption. The 1965 occupancy agreement was, therefore, the operative occupancy agreement between the parties.

The exterior of the plaintiff's unit was painted at times before and after 1983 with labor supplied by her. In 2007, the defendant replaced sections of the exterior siding of the plaintiff's unit and painted the replaced siding a different color than that used on the rest of the unit. Since 2007, the plaintiff requested that the defendant pay for the painting of the exterior of the unit. On July 9, 2009, the defendant notified the plaintiff that the exterior of her unit was deteriorating and that it required painting. The plaintiff's unit had not been painted as of the time of trial. The parties, then, have been at loggerheads: the defendant, relying on its regulations, will not pay for the labor involved in painting the exterior of the plaintiff's unit, and the plaintiff, relying on her interpretation of the 1965 occupancy agreement, will not herself supply the labor.[4]

The plaintiff brought this action in the small claims session of the Superior Court, seeking $5000 in damages for the cost of painting the exterior of her unit. The defendant transferred the claim to the regular docket of the Superior Court, where the plaintiff filed a two count complaint alleging: (1) that the defendant breached the 1965 occupancy agreement by refusing to perform the painting and attempting to impose on the plaintiff the cost of repair and maintenance of her unit, when such costs were part of the defendant's obligation under the 1965 occupancy agreement; and (2) that in so doing, the defendant acted with reckless indifference and breached the implied covenant of good faith and fair dealing. The defendant filed an answer and two special defenses, alleging estoppel and waiver.

The court found that the 1965 occupancy agreement was created as a bylaw of the defendant and that the 1965 occupancy agreement was never amended pursuant to the procedure required to amend bylaws. The court further found that the 1965 occupancy agreement omitted, although it did reference, rules and regulations concerning the use of common areas; "it [was] the opinion of the court that the intent of reference to the rules and regulations in the initial documents and, in fact in the first establishment of rules and regulations was limited to rules and regulations concerning the common areas used by the entire membership and not the individual obligations between the [defendant] and the unit owners."

In finding in favor of the plaintiff on her breach of contract claim, the court, citing General Statutes §§ 47-211 and 47-210 (b),[5] found that "the [defendant's] attempt to amend the occupa[ncy] agreement by means of a collateral amendment through the rules and regulations established by a nine member board of directors is unconscionable and unenforceable." The court further found that the defendant breached the implied covenant of good faith and fair dealing. The court denied the defendant's special defenses. The court awarded the

plaintiff $5000 in damages for the necessary painting of the exterior of the unit, as well as costs and attorney's fees pursuant to General Statutes § 52-251a,[6] and ordered the defendant to perform all necessary repairs. This appeal followed.

I

The defendant first claims that the court erred in concluding that the defendant had breached the 1965 occupancy agreement by relying on a subsequent regulation to alter the terms of the agreement. We agree.

The court's finding of a breach of contract was based on its determination that the defendant did not have the authority "unilaterally" to alter the 1965 occupancy agreement by adopting the regulation regarding the allocation of painting costs. Our analysis is informed by an examination of the relevant provisions of the organizing documents of the defendant and its regulations; the inquiry involves a question of law that we review de novo. See *Weldy* v. *Northbrook Condominium Assn., Inc.*, 279 Conn. 728, 736, 904 A.2d 188 (2006).

We begin with the court's analysis. The court classified the 1965 occupancy agreement as a bylaw pursuant to General Statutes § 47-202 (5).[7] The court then concluded that the procedure for amending the bylaws had not been followed and that it was a breach of contract for the defendant to alter the 1965 occupancy agreement collaterally by enacting regulations and, then to insist that the subsequent regulations controlled the prior agreement, and to refuse to pay for the labor involved in painting exterior surfaces.

The defendant is a cooperative corporation organized in 1965 under the auspices of the Federal Housing Administration. The certificate of incorporation, filed with the state of Connecticut, declared the defendant to be a nonstock corporation. The defendant enacted an initial set of bylaws, which governed its operating procedures, and entered into a regulatory agreement with the Federal Housing Administration. The bylaws defined "members" as the original board of directors and such subsequent subscribers who gained the approval of the board; the members were to be offered occupancy agreements, "which Occupancy Agreements shall all be of one class." A standard occupancy agreement also was promulgated at the inception of the cooperative venture; this is the agreement referenced in this opinion as the "1965 occupancy agreement." The affairs of the defendant were to be administered by the board of directors, which in turn was elected by the members.

The defendant has contested on appeal the trial court's characterization of the occupancy agreement as a "bylaw." We agree that the agreement does not fit within standard definitions of bylaws; cf. General Statutes § 47-202 (5); and the original form for occupancy

agreements was referred to, but not included in, the original set of bylaws.

We do not, however, view the question of whether the occupancy agreement was a bylaw to be material. If the appropriate question was whether a regulation, adopted by the board of directors, effectively could alter a bylaw, which could be amended only by a two-thirds vote of the membership, then such characterization of the occupancy agreement as a bylaw may well make a difference. Whether we view the occupancy agreement as a bylaw or a lease or rental contract, however, the result is the same, because the subsequent regulation was not fatally inconsistent with the preexisting occupancy agreement, and, indeed, such regulations were specifically contemplated by the occupancy agreement. Because application of the regulation did not violate the terms of the 1965 occupancy agreement, the court erred in concluding that the defendant breached the contract.[8]

We are guided by *Weldy* v. *Northbrook Condominium Assn.*, *Inc.*, supra, 279 Conn. 728. In *Weldy*, the plaintiff condominium owners sought to enjoin the defendant condominium association and its board of directors from enforcing a new regulation, adopted by the board rather than by a two-thirds vote of the membership, regarding maximum allowable leash length for household pets, on the ground that the board had exceeded its authority in adopting the regulation. Id., 731. The condominium's declaration provided, as a use restriction, that household pets were to be restrained by leash or other comparable means. Id., 730–31. The declaration also provided that the board of directors had the power to make regulations as were necessary to carry out the intent of the use restrictions. Id., 731. The bylaws provided that regulations included in the declaration could be amended only in the manner provided for amending the declaration, for which a two-thirds vote of the unit owners and mortgagees was required. Id. The trial court granted the defendant's motion for summary judgment, reasoning that because the leash length requirement was a clarification of an existing rule in the declaration rather than an amendment, the board had not exceeded its authority in adopting the clarification. Id., 732. This court disagreed, viewing the subsequent regulation to be an amendment to a provision in the declaration. Id. Because the subsequent regulation had not been approved by a two-thirds vote of the owners and mortgagees, this court held the regulation to be unenforceable. *Weldy* v. *Northbrook Condominium Assn.*, *Inc.*, 89 Conn. App. 581, 589, 874 A.2d 296 (2005), rev'd, 279 Conn. 728, 904 A.2d 188 (2006).

Holding that the subsequent regulation was valid and enforceable, our Supreme Court reversed the judgment of this court. *Weldy* v. *Northbrook Condominium Assn.*, *Inc.*, supra, 279 Conn. 744. It began its analysis with

a discussion of the Common Interest Ownership Act, General Statutes § 47-200 et seq., which "is a comprehensive legislative scheme regulating all forms of common interest ownership," and which was passed in 1983 "to remedy problems arising from unconscionable lease agreements in condominiums and other residential common interest communities created prior to 1984." (Internal quotation marks omitted.) Id., 735 and n.3. The court further noted that "[a] condominium association also is empowered, subject to the declaration provisions, to '[a]dopt and amend bylaws and rules and regulations'; General Statutes § 47-244 (1); and to '[r]egulate the use . . . of common elements . . . .' General Statutes § 47-244 (6)." *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 736.

The Supreme Court concluded: "Because an association's power should be interpreted broadly, the association, through its appropriate governing body, is entitled to exercise all powers of the community except those reserved to the members. . . . This broad view of the powers delegated to the . . . board of directors is consistent with the principle inherent in the condominium[9] concept . . . that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. . . . Accordingly, the standard of review most commonly employed in reviewing a board's authority to adopt rules or regulations is that, provided . . . a board-enacted rule does not contravene either an express provision of the declaration or a right reasonably inferable therefrom, it will be found valid, within the scope of the board's authority." (Citation omitted; internal quotation marks omitted.) Id., 738. The court held that the board was empowered to act because the leash length limitation implemented, and thus was consistent with, an expressed intent of the declaration that household pets be properly restrained and controlled while in common areas. Id., 739. In sum, the regulation was valid because it reasonably clarified the intent of the restriction, even though it logically expanded the restriction.

The court's conclusion in *Weldy* that a board enacted rule that does not contravene the declaration, or a right reasonably inferable therefrom, is valid and within the scope of the board's authority informs the result in the present case.[10] "A declaration is an instrument recorded and executed in the same manner as a deed for the purpose of creating a common interest community." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 726 n.1, 873 A.2d 898 (2005); see also General Statutes § 47-220. "[T]he declaration operates in the nature of a contract, in that it establishes the parties' rights and obligations

. . . ." Id., 734. The organizing documents previously referenced serve the function of the declaration in *Weldy*. The portion of the 1965 cooperative plan entitled "Introduction—The Cooperative Housing Corporation" provides insight into the cooperative structure. This section of the 1965 cooperative plan, one of the organizing documents, states: "cooperatives have met the desires of the apartment dweller for home ownership and better control over his community environment. . . . Stonybrook Gardens Cooperative, Inc., is organized for the benefit of its resident-owners, or members. . . . The most important part of the cooperative is the individual member. The cooperative has been created for his benefit in conjunction with that of his fellow members. . . . When a dwelling unit is available for occupancy, the member enters into an occupancy agreement with his cooperative corporation. This agreement specifically defines the member's right to occupancy of his apartment. The occupancy agreement . . . establishes certain limitations required for the benefit of the entire community."

More specifically, the occupancy agreement itself specifically anticipated future regulations. Article 14 of the 1965 occupancy agreement provided that members were to abide by "the Charter, Regulatory Agreement between the Corporation and the Federal Housing Commissioner, By-Laws, *rules and regulations* of the Corporation and *any amendments thereto* . . . . The Member hereby ratifies all agreements executed by the Cooperative Corporation on or before the date hereof." (Emphasis added.)

The literal language of the occupancy agreement, then, required the plaintiff to abide by future regulations. A limitation must be placed upon the obligation: in order to compel obedience, the regulation must be reasonable and not materially inconsistent. See *Weldy* v. *Northbrook Condominium Assn.*, *Inc.*, supra, 279 Conn. 741–42 (regulation consistent with condominium declaration). We examine the language of the contractual documents in their entirety to determine whether the regulation regarding payment for the labor involved in painting the exterior of units was consistent with the underlying documents, and thus an appropriate exercise of regulatory authority, or inconsistent, thus requiring ratification by two thirds of the defendant's membership. We apply traditional standards for the interpretation of contracts. "In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . . We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . .

"[A] contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . *The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Harbour Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, 300 Conn. 254, 260–61, 14 A.3d 284 (2011). We will not construe a contract's language in such a way that it would lead to an absurd result. See *Waesche* v. *Redevelopment Agency*, 155 Conn. 44, 51, 229 A.2d 352 (1967).

We conclude that, in the context of the entire contractual structure, the regulation regarding payment for the labor involved in painting the exterior of the units was reasonable and foreseeable. The structure of the a cooperative corporation is fundamentally different from a landlord and tenant relationship conducted at arm's length. The painting in the present case had to be either paid for by someone or accomplished voluntarily by the member. If the defendant were to provide the labor, payment would have to be provided ultimately by the members.[11] If the members were to supply the labor, they would do so either by paying for the service or doing it themselves. The regulation, then, ultimately did not impose a new cost, but rather allocated payment for labor directly to the members rather than indirectly through the defendant.[12]

Recognizing the validity of the regulation avoids an unworkable or absurd result as well. The standard occupancy agreements were amended from time to time. The parties stipulated that since 1983, the occupancy agreements have expressly provided that each member was responsible for the labor costs for painting the exterior of the units. If the plaintiff's view was adopted, then other members would bear the cost of providing for her unit, while she would not be contributing toward the cost of their units. The certificate of incorporation states that there "shall be but one class of members." The contractual documents are to be read as a whole and bizarre results are to be avoided. See *Harbour Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, supra, 300 Conn. 261.

We conclude that because (1) applying the regulation to the plaintiff complies with the literal language of the

occupancy agreement, (2) the regulation is not necessarily fundamentally inconsistent with the occupancy agreement and provides a reasonable method of allocating the relevant costs, and (3) application of the regulation to the occupancy agreement avoids a bizarre and unworkable result, the trial court's conclusion that the defendant breached its contract with the plaintiff must be reversed.

The court also based its finding of a breach of contract on unconscionability under General Statutes § 47-210.[13] We agree with the defendant that the court's finding cannot stand. First, we have determined that the defendant did not breach the contract. Second, unconscionability was never alleged by the plaintiff in her amended complaint or in her posttrial brief. "It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations [in] his complaint. . . . A complaint must fairly put the defendant on notice of the claims . . . against him. . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . Only those issues raised by the [plaintiff] in the latest complaint can be tried before the jury." (Internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 621, 99 A.3d 1079 (2014).

## II

The defendant next claims that the court erred in concluding that the defendant breached the implied covenant of good faith and fair dealing. We agree.

The court concluded that the defendant breached the implied covenant of good faith and fair dealing "in . . . ignoring the rights of the plaintiff by attempting to nullify or unilaterally amend her contract rights and seeking retribution for her claims by threatening monetary penalties . . . ."

"The duty of good faith under . . . § 47-211 requires that [e]very contract or duty governed by [the Common Interest Ownership Act] imposes an obligation of good faith in its performance or enforcement. The common-law duty of good faith and fair dealing implicit in every contract requires that neither party [will] do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review." (Citations omitted; internal quotation marks omitted.) *Harley* v. *Indian Spring Land*

*Co.*, 123 Conn. App. 800, 837, 3 A.3d 992 (2010).

The court based its finding of bad faith on the same conduct that it found to be a breach of contract. For the reasons set forth in part I of this opinion, the defendant did not breach the 1965 occupancy agreement or "ignore the rights of the plaintiff" by adopting the regulation regarding the painting of the exterior of the units and applying it to the plaintiff. Rather, the regulation was reasonable and was not inconsistent with the 1965 occupancy agreement. Because the court's finding of a breach of the covenant of good faith and fair dealing was premised on its conclusion that the defendant breached the 1965 occupancy agreement by applying the regulation to the plaintiff, its finding of a breach of the implied covenant of good faith and fair dealing cannot stand.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.

[1] The defendant also claims that the relief awarded by the court was improper. Because we agree with the defendant on its other claims and reverse the judgment, we need not address this claim.

[2] The defendant's bylaws recognized that occupancy agreements were offered to members; the purchaser of a membership in the defendant was entitled to an occupancy agreement. The occupancy agreement functionally was a lease; it provided that "the [c]orporation hereby lets to the [m]ember, and the [m]ember hereby hires and takes from the [c]orporation, dwelling unit located at . . . ."

[3] The first set of "rules and regulations" was enacted by the board of directors in 1974. These enactments had no bearing on the present dispute.

[4] The parties stipulated that, apparently because of the dispute, the defendant also "has not performed other maintenance and repair items" required by the terms of the 1965 occupancy agreement.

[5] General Statutes § 47-210 (b) provides: "The court, on finding as a matter of law that a contract or contract clause was unconscionable at the time the contract was made, may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause or limit the application of any unconscionable clause in order to avoid an unconscionable result." The court inadvertently referred to this section as § 47-10 (b); it is clear that this was only a typographical error.

[6] Section 52-251a permits the imposition of costs and fees, including attorney's fees, to be imposed on a defendant who has transferred the case from small claims to the regular docket of the Superior Court and has not prevailed in the action.

[7] The court stated that the 1965 occupancy agreement was a bylaw and also that it was "an extension of the bylaws."

General Statutes § 47-202 (5) provides that " '[b]ylaws' " means the instruments, however denominated, that contain the procedures for conduct of the affairs of the association regardless of the form in which the association is organized, including any amendments to the instruments."

[8] The defendant raises additional grounds supporting its claim that the court erred in concluding that it had breached the 1965 occupancy agreement; the defendant also abandoned its plain error argument under General Statutes § 47-249 at oral argument before this court. We do not address the abandoned argument, and we need not address the defendant's other arguments because we agree that the court erred in finding a breach of contract.

[9] Although *Weldy* concerned a condominium association rather than a cooperative, this difference does not affect the result in this case. The Common Interest Ownership Act, the statutory backdrop for *Weldy*, applies to all forms of common interest ownership. See General Statutes § 47-202 (9). Moreover, the comparison between the regulations, on the one hand, and the organizing documents, on the other hand, is both obvious and material to all forms of common ownership.

[10] There is also a significant difference between the facts in *Weldy* and the facts in this case. In *Weldy*, the declaration expressly provided that the regulation in question could not be *amended* without a vote of two thirds of the membership. In the present case, on the other hand, the contractual agreement expressly provides that the agreement *is subject to* future regulations. The subscribing member, then, objectively recognizes that the contractual relationship may be subject to reasonable regulations to be enacted in the future.

[11] Article 1 (g) of the 1965 occupancy agreement provided that the member should pay "[t]he estimated cost of repairs, maintenance and replacement of the Project property . . . ."

[12] Article 11 of the occupancy agreement required the member to pay for some items, including "redecoration," and the defendant was to pay for all other repairs and maintenance. The term "redecoration" may be quite broad: "redecorate" is defined in Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) as "to freshen or change in appearance." Painting fits within that definition, although we recognize that painting the exterior of a structure may not commonly be considered redecorating.

[13] See footnote 5 of this opinion.

---